SAMUEL LEWIS JOHNSON *v.* JOHN R. MANSON,
COMMISSIONER OF CORRECTION
(11810)

HEALEY, PARSKEY, SHEA, DANNEHY and SATTER, Js.

Argued February 7—decision released May 28, 1985

*L. D. McCallum,* assistant attorney general, with whom, on the brief, were *Joseph I. Lieberman,* attor-

ney general and *Michael Donahue,* law student intern, for the appellant (respondent).

*Todd D. Fernow,* with whom was *Michael R. Sheldon,* for the appellee (petitioner).

ARTHUR H. HEALEY, J. The issue presented in this habeas corpus proceeding is whether the petitioner, Samuel Lewis Johnson, must be credited under General Statutes § 18-98[1] for the 109 days he spent in a Florida jail while resisting extradition to Connecticut for trial on the charge of escape from custody, a violation of General Statutes § 53a-171.[2] The trial court granted the writ holding that § 18-98 authorized the 109 days credit "for time served in an out of state correctional institution while awaiting extradition to Connecticut, provided the Connecticut charge is the only reason the prisoner is being held ."[3] This appeal by the respondent commissioner of correction (commissioner) followed.

---

[1] General Statutes § 18-98, entitled "Confinement where bail unobtainable: Presentence confinement credit prior to July 1, 1981," provides: "Any person who has been denied bail or who has been unable to obtain bail and who is subsequently imprisoned for an offense committed prior to July 1, 1981, is entitled to commutation of his sentence by the number of days which he spent in a community correctional center from the time he was denied or was unable to obtain bail to the time he was so imprisoned. The commissioner of correction shall, if such person has conformed to the rules of the institution, credit such person with the number of days to which the supervising officer of the correctional center where such person was confined while awaiting trial certifies such person was confined between the denial of bail to him or his inability to obtain bail and his imprisonment."

[2] General Statutes § 53a-171, entitled "Escape from custody: Classification," provides: "(a) A person is guilty of escape from custody if he escapes from custody.

"(b) If a person has been arrested for, charged with or convicted of a felony, escape from such custody is a class C felony, otherwise, escape from custody is a class A misdemeanor."

[3] The trial court denied that portion of the petitioner's claim that sought an additional credit of thirty-six days of statutory good time under General Statutes § 18-98c. That portion of the relief sought is not involved in

On September 28, 1979, the petitioner was incarcerated, having been charged with six counts of robbery in the first degree in violation of General Statutes § 53a-134. Although bond had been set for him, he was unable to post bond. On that date, he was brought to the Superior Court, geographical area number fourteen on Morgan Street, for arraignment on the unrelated charge of failure to appear in the first degree in violation of General Statutes § 53a-172. While awaiting arraignment, he escaped from the detention area of the courthouse and fled from the state of Connecticut. On October 1, 1979, an arrest warrant was issued and an information filed charging him with escape from custody in violation of § 53a-171. On December 4, 1979, the petitioner was arrested in Florida upon receipt of information that he was wanted for escape in Connecticut. Upon his arrest, he was charged with being a fugitive from justice and was placed in a Florida county jail. Presented in court in Florida, he refused to waive extradition and was furnished counsel to assist with his defense against extradition. On February 13, 1980, the governor of Connecticut made formal demand upon the governor of Florida for the petitioner's return to Connecticut. The governor of Florida issued his rendition warrant on February 28, 1980, directing Florida authorities to deliver the petitioner to Connecticut authorities. After his arrest on the warrant of the governor of Florida, the petitioner's Florida counsel sought a writ of habeas corpus. After a hearing on his petition which contested the validity of the extradition, his petition was denied.

On March 22, 1980, he was returned to Connecticut, formally arrested on the charge of escape from custody and held in lieu of bond for prosecution of that charge.

this appeal. The petitioner's period of confinement in Florida arose solely from his "awaiting extradition" to Connecticut; no criminal charges were lodged against him by Florida authorities.

On August 17, 1980, upon conviction and sentencing on that charge, the petitioner was committed to the custody of the respondent. In due course, the commissioner credited the petitioner's sentence with the presentence confinement time in Connecticut, i.e., from March 22, 1980, to August 17, 1980. He declined, however, to credit his criminal sentence for any time spent in confinement in Florida before his extradition, i.e., from December 4, 1979, to March 22, 1980.

On this appeal, the respondent commissioner claims that: (1) the trial court erred in concluding that § 18-98 entitled the petitioner to a credit on his Connecticut sentence for the time that he was incarcerated in Florida awaiting extradition to Connecticut; and (2) even though § 18-98 does not, by its terms, require the time credit sought, the denial of such credit to the plaintiff does not deny, contrary to the petitioner's claims, his right to equal protection of the laws; U.S. Const., amend. XIV; Conn. Const., art. I § 20;[4] or due process of law. U.S. Const., amend. XIV; Conn. Const., art. I § 8.[5]

We turn first to the claim involving the statutory construction of § 18-98. We agree with the commissioner that the trial court erred in concluding that § 18-98 authorized credit for 109 days on his Connecticut criminal sentence.

Section 18-98 provides that "[a]ny person who has been denied bail or who has been unable to obtain bail and who is subsequently imprisoned for an offense

---

[4] The fourteenth amendment to the United States constitution provides in part: "nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Article first, § 20, of the Connecticut constitution provides in part: "No person shall be denied the equal protection of the law . . . ."

[5] Article first, § 8, of the Connecticut constitution provides in part: "No person shall . . . be deprived of life, liberty or property without due process of law . . . ."

. . . is entitled to commutation of his sentence by the number of days which he spent in a *community correctional center* from the time he was denied or was unable to obtain bail to the time he was so imprisoned." (Emphasis added.) This provision establishes "presentence confinement credit . . . for time served 'in a community correctional center' "; *Moscone* v. *Manson,* 185 Conn. 124, 132 n.5, 440 A.2d 848 (1981); "to which the supervising officer of the correctional center where such person was confined *while awaiting trial* certifies such person was confined between the denial of bail to him or his inability to obtain bail and his imprisonment." (Emphasis added.) General Statutes § 18-98.

The commissioner argues that while the statute authorizes him to credit the criminal sentence of one imprisoned "awaiting trial" and sentencing, it does not in any way authorize or require him to extend the same credit to one "awaiting extradition." "Awaiting trial" or "awaiting sentence" is, he claims, just not the same under § 18-98 as "awaiting extradition." Additionally, he differs with the trial court's (and the petitioner's) posture that the statute is ambiguous as to whether its "community correctional center" language applies to a person confined outside Connecticut without bail who is awaiting extradition; the commissioner contends that this language clearly relates to intrastate and not interstate procedures.[6] Opining, without conceding, that even if the trial court may have construed § 18-98 as it did because it was seeking to avoid constitutional

---

[6] The trial court's decision does not refer at all to General Statutes § 18-86 which is entitled "Transfers between institutions of department [of correction]" and which provides: "The commissioner may transfer any inmate of any of the institutions or facilities of the department to any other such institution or facility, irrespective of the institution to which the inmate was originally committed or the length of his sentence, when it appears to the commissioner that the best interests of the inmate or the other inmates will be served by such action."

problems and not place it in constitutional "jeopardy"; see *Moscone* v. *Manson,* supra, 132–34 (*Healey, J.,* concurring); the commissioner rejects that posture, claiming that to credit the time sought would require construing § 18-98 to mean something that clearly is not expressed therein. The commissioner also takes issue with the trial court's view that his construction of § 18-98 is unreasonable and thwarts the statutory purpose in requiring a different result in the case of one who is confined outside Connecticut while contesting extradition, as opposed to one confined in Connecticut facilities other than "community correctional centers."

Our decision in *Houston* v. *Warden,* 169 Conn. 247, 363 A.2d 121 (1975), in which we also construed § 18-98, is instructive on the issue of statutory construction: "The language of the statute is clear and unambiguous. Courts cannot, by construction, read into statutes provisions which are not clearly stated. *Robinson* v. *Guman,* 163 Conn. 439, 444, 311 A.2d 57 [1972]; *United Aircraft Corporation* v. *Fusari,* 163 Conn. 401, 415, 311 A.2d 65 [1972]. 'It is not for us to search out some intent which we may believe the legislature actually had and give effect to it, but we are confined to the intention which is expressed in the words it has used.' *Connecticut Light & Power Co.* v. *Walsh,* 134 Conn. 295, 301, 57 A.2d 128 [1948].

" 'It is a cardinal rule of construction that statutes are to be construed so that they carry out the intent of the legislature. This intent is to be ascertained from the language of the statute itself, if the language is plain and unambiguous. *Hurlburt* v. *Lemelin,* 155 Conn. 68, 73, 230 A.2d 36 [1967]; *Landry* v. *Personnel Appeal Board,* 138 Conn. 445, 447, 86 A.2d 70 [1952]. Where the legislative intent is clear there is no room for statutory construction. *Little* v. *Ives,* 158 Conn. 452, 455, 262 A.2d 174 [1969]; *State ex rel. Cooley* v. *Kegley,* 143

Conn. 679, 683, 124 A.2d 898 [1956]; *State ex rel. Rourke* v. *Barbieri,* 139 Conn. 203, 207, 91 A.2d 773 [1952].' *Hartford Hospital* v. *Hartford,* 160 Conn. 370, 375, 279 A.2d 561 [1971]. ' "We must construe the act as we find it, without reference to whether we think it would have been or could be improved by the inclusion of other provisions." *Murphy* v. *Way,* 107 Conn. 633, 639, 141 A. 858 [1928].' *State* v. *Nelson,* 126 Conn. 412, 416, 11 A.2d 856 [1940]." *Houston* v. *Warden,* supra, 251–52.

"A legislative intention not expressed in some appropriate manner has no legal existence."[7] (Citations omitted.) *State* v. *Smith,* 194 Conn. 213, 222, 479 A.2d 814 (1984). We point out that § 18-98 as written has no language about "while awaiting extradition," but rather clearly specifies "while awaiting trial." It is obvious that the "awaiting trial" criterion is critical in determining credits for those so entitled. Where statutory language is clearly expressed, as here, courts must apply the legislative enactment according to the plain terms and "cannot read into the terms of a statute something which manifestly is not there in order to reach what the court thinks would be a just result." *Rosnick* v. *Aetna Casualty & Surety Co.,* 172 Conn. 416, 422, 374 A.2d 1076 (1977), quoting *State* v. *Malm,* 143 Conn. 462, 467, 123 A.2d 276 (1956).[8]

---

[7] We have not been directed to, nor does our research disclose, that § 18-98 was intended to apply to persons confined outside Connecticut contesting extradition.

It is worth noting that while Connecticut adopted the Uniform Criminal Extradition Act in 1957; Public Acts 1957, No. 362; § 18-98, including its "while awaiting trial" language, was not enacted until 1967. Public Acts 1967, No. 869.

[8] It is argued by the petitioner that a 1976 administrative "directive" of the respondent "expressly contemplates the occurrence of the situation presented in this case." We are not persuaded by this claim. The relevant part of the "directive" states: "Time served in another state while held under a Connecticut warrant will count as jailtime credit when the individual is being held on Connecticut charges *only.* " Administrative Direc-

It is basic, of course, that a statute is to be construed as a whole and that the words used therein must be interpreted in their plain and ordinary meaning "unless the context indicates that a different one was intended." *Caldor, Inc.* v. *Heffernan,* 183 Conn. 566, 570, 440 A.2d 767 (1981). If the language of the statute is clear and unambiguous, it is assumed that the words themselves express the intention of the legislature and there is no room for judicial construction. *Mazur* v. *Blum,* 184 Conn. 116, 118–19, 441 A.2d 65 (1981); *Aaron* v. *Conservation Commission,* 183 Conn. 532, 548, 441 A.2d 30 (1981); *Doe* v. *Manson,* 183 Conn. 183, 186, 438 A.2d 859 (1981). "When legislation contains a specific definition, the courts are bound to accept that definition." (Citations omitted.) *International Business Machines Corporation* v. *Brown,* 167 Conn. 123, 134, 355 A.2d 236 (1974); *Toll Gate Farms, Inc.* v. *Milk Regulation Board,* 148 Conn. 341, 347, 170 A.2d 883 (1961). "Where a statute does not define a term, it is appropriate to look to the common understanding expressed in the law and in dictionaries." *Doe* v. *Manson,* supra; *Ziperstein* v. *Tax Commissioner,* 178 Conn. 493, 500, 423 A.2d 129 (1979). In applying the usual and accepted meaning to words not defined in a statute where to do so, as here, comports with the statutory purpose, one court stated that "[w]e derive

tives, Department of Correction, c. 5.1 (October, 1976). This interpretation placed upon a statute or regulation by the one charged with its administration "is entitled to weight in its construction." *State* v. *Sober,* 166 Conn. 81, 90, 347 A.2d 61 (1974). There is, of course, no evidence in the record before us that the respondent has in fact applied this directive to any situation like the one before us. Moreover, while it is true that Florida did not charge the petitioner with any substantive crime under the law of Florida, he was arrested in Florida, prior to the institution of extradition proceedings, as a fugitive from justice from the state of Connecticut. Additionally, the petitioner's brief does refer to an attorney general's opinion, dated April 5, 1977, and subsequent to the respondent's 1976 direction. That opinion stated that General Statutes §§ 18-97 and 18-98 do *not* apply to presentence confinement served by inmates confined in *other* states while contesting extradition to Connecticut.

the words' usual and accepted meanings from sources presumably known to the statute's enactors, such as their use in other legal contexts and dictionary definitions." *Commonwealth* v. *Zone Book, Inc.*, 372 Mass. 366, 369, 361 N.E.2d 1239 (1977).

The claim that the "community correctional center" language imports ambiguity into § 18-98 lacks merit. The petitioner there asserts that § 18-98 generates absurd results when applied to his confinement in Florida. It is hardly absurd to interpret the plain, straightforward language of § 18-98 to mean what it patently expresses. Moreover, the petitioner has pointed to nothing that demonstrates that the legislature intended to extend to fugitives from Connecticut justice awaiting extradition the credit he now seeks. Cognizant as we are that "[i]t is not for this court to impose obligations not intended by the legislature"; *Doe* v. *Institute of Living, Inc.*, 175 Conn. 49, 65, 392 A.2d 491 (1978); we are also aware that no word in a statute should be treated as insignificant or superfluous. *Kulis* v. *Moll*, 172 Conn. 104, 111, 374 A.2d 133 (1976). A "community correctional center" is a "correctional institution"; General Statutes § 1-1 (w); and encompasses institutions situated in Connecticut rather than those outside Connecticut in which one awaiting extradition is confined.[9] It goes without saying that under

---

[9] Some suggestion is made that the respondent commissioner has in practice broadened the definition of "community correctional center," thereby enhancing the petitioner's claim.

First, it seems to be suggested that because the commissioner extends credits under § 18-98 to those who may be confined in Connecticut in an institution that is not a "community correctional center," this fuels the petitioner's claim for § 18-98 credit on his Florida confinement. This lacks merit. A "community correctional center" is a Connecticut "correctional institution"; General Statutes § 1-1 (w); and under General Statutes § 18-86, the respondent "may transfer *any* inmate of *any* of the institutions or facilities of the [correction] department to any other such institution or facility . . . ." (Emphasis added.) This use of statutory authority available to the respondent, as well as the application of common sense to the statutory

such a view Connecticut authorities have complete control over inmates confined in Connecticut, including those confined outside Connecticut pursuant to § 18-102, in contrast to the lack of control over an inmate wanted in Connecticut who is confined elsewhere awaiting extradition. It is true that "[w]here the

scheme involving the commissioner's exercise of his statutory authority over correctional institutions in Connecticut, hardly supports this suggestion of the petitioner.

Second, the New England Interstate Corrections Compact, General Statutes § 18-102 et seq., of which Connecticut is a member, is advanced as demonstrating a broad view of "community correctional center" which avails the petitioner. The argument is that permitting one confined in a "community correctional center" in this state to be transferred and confined in a penal or correctional facility outside Connecticut in another signatory state makes ambiguous language in § 18-98, an ambiguity which should be resolved in the petitioner's favor. This falls short of the mark. The Compact in § 18-102 is not only sui generis but replete with clear legislative enunciation of the protection of specific rights of any "inmate" transferred thereunder.

Significantly, any "inmate" transferred outside Connecticut *"shall at all times be subject to the jurisdiction of the sending state [Connecticut] and may at any time be removed therefrom for transfer to a prison or other institution within the sending state . . . ."* (Emphasis added.) Section 18-102, Art. IV (c). The fact that an inmate is confined in a receiving state "shall not deprive any inmate so confined of any legal rights which [he] would have had if confined in an appropriate institution of the sending state." Section 18-102, Art. IV (e). Thus, the control under the Compact over the inmate outside Connecticut is completely distinguishable from the "control" Connecticut had over the petitioner while confined in Florida. In addition, the unique arrangement of Connecticut prisoners confined elsewhere has the plain mandated intent of our legislature, and assuming, without deciding, a prisoner's "legal rights" under Article IV (e) would include his right to have credits given him, in an appropriate case, under § 18-98. In any event, we note that recently the United States Supreme Court has said: "Just as an inmate has no justifiable expectation that he will be incarcerated in any particular prison within a state, he has no justifiable expectation that he will be incarcerated in any particular state." (Footnote omitted.) *Olim* v. *Wakinekona,* 461 U.S. 238, 245, 103 S. Ct. 1741, 75 L. Ed. 2d 813 (1983). The "broad statement of purpose" in Article I of § 18-102 "in no way limits the discretion of the commissioner of correction to transfer a prisoner to facilities in a member state. It therefore does not 'create the kind of substantive interest which is required before a state created "liberty" interest can be said to exist.' *Lombardo* v. *Meachum,* 548 F.2d 13, 15 (1st Cir. 1977)." *Sisbarro* v. *Warden,* 592 F.2d 1, 3–4 (1st Cir. 1979).

meaning of a statute is in doubt, reference to legislation in other states and jurisdictions which pertains to the same subject matter, persons, things, or relations may be a helpful source of interpretative guidance." 2A Sutherland, Statutory Construction (Sands 4th Ed.) § 52.03. Although there are statutes similar to, but not identical to, § 18-98 in other states, the meaning of our statute is not ambiguous. Thus, interpretation of such statutes elsewhere, while instructive, is not controlling. In this case, Connecticut is the final arbiter of its own laws. *State* v. *Menillo,* 171 Conn. 141, 147, 368 A.2d 136 (1976); see *Stone* v. *Stone,* 292 So. 2d 686, 692 (La. 1974). It was thus error for the trial court to conclude that § 18-98 authorized the credit of 109 days on the petitioner's Connecticut criminal sentence.

This determination of error requires that we examine the constitutional issues of the denial of equal protection and due process raised by the petitioner. His basic equal protection claim is that the denial of the credit for the Florida confinement, where "he was imprisoned pursuant to a Connecticut charge of escape from custody," effectively lengthens the "lawfully imposed sentence" he received for the same offense in Connecticut; this deprives him, he contends, of his right to equal protection of the law under the fourteenth amendment to the United States constitution and article first, § 20, of the Connecticut constitution.[10] We do not agree.

The equal protection clause of the fourteenth amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the law."

_____

[10] There is no determination in the record before us that the petitioner was determined to be an indigent. Therefore, not being a member of that class, he cannot claim any constitutional deprivation for that reason. In fact, he concedes that he was confined because the Florida trial court denied him bail, not because he was indigent and therefore unable to post it.

Our constitutional counterpart provides that "[n]o person shall be denied the equal protection of the law. . . ." Conn. Const., art. I § 20. The petitioner seeks credit for time when he was not "within [the] jurisdiction" of Connecticut, but rather at a time when he was a fugitive from it. His very act of fleeing per se generated a distinct criminal offense, i.e., escape from custody. "[T]he phrase 'within its jurisdiction' was intended in a broad sense to offer the guarantee of equal protection to all *within* a State's boundaries, and to all upon whom the State would impose the obligations of its laws . . . [and this phrase] does not detract from, but rather confirms, the understanding that the protection of the Fourteenth Amendment extends to anyone, citizen or stranger, who *is* subject to the laws of a State, and reaches into every corner of a State's territory." (Emphasis added.) *Plyler* v. *Doe,* 457 U.S. 202, 214–15, 102 S. Ct. 2382, 72 L. Ed. 2d 786, reh. denied, 458 U.S. 1131, 103 S. Ct. 14, 73 L. Ed. 2d 1401 (1982). The constitutional parameter of this right existed before *Plyler*. A state's equal protection constitutional obligation "[m]anifestly . . . can be performed only where its laws operate, that is, *within its own jurisdiction*. It is there that the equality of legal right must be maintained. That obligation is imposed by the Constitution upon the States severally as governmental entities,—each responsible for its own laws establishing the rights and duties of persons *within its borders.*" (Emphasis added.) *Missouri ex rel. Gaines* v. *Canada,* 305 U.S. 337, 350, 59 S. Ct. 232, 83 L. Ed. 208 (1938).

It is, therefore, clear that the petitioner was not within the jurisdiction of Connecticut when confined in Florida awaiting extradition. The legal authority to arrest him under a warrant issued in Connecticut stopped at our state line. Actually, he was not formally arrested by Connecticut authorities until he was

returned to Connecticut on March 22, 1980, and held for prosecution in this state. Our legislature cannot act to bind the petitioner in Florida nor can it bind Florida authorities. His initial apprehension in Florida caused him to be arrested under Florida law as a fugitive from justice. Moreover, "[w]henever the executive of the [asylum] State, upon whom such a demand has been made, by virtue of his warrant, causes the arrest for delivery of a person charged as a fugitive from the justice of another State, the prisoner is held in custody only under color of authority derived from the Constitution and laws of the United States . . . . " *Roberts* v. *Reilly,* 116 U.S. 80, 94, 6 S. Ct. 291, 29 L. Ed. 544 (1885). Therefore, the petitioner's claim[11] that he was held in Florida on a Connecticut charge and was held under color of Connecticut law and is therefore entitled to equal protection under Connecticut law must fail.[12]

---

[11] This claim includes the assertion that the petitioner is entitled to equal protection because of the "agency relationship" that is created once Connecticut, the initiator of legal proceedings against him, makes its demand upon Florida. He maintains such a relationship exists "as a matter of law." To support this in this extradition proceeding he cites *Narel* v. *Liburdi,* 185 Conn. 562, 570, 441 A.2d 177 (1981), cert. denied, 456 U.S. 928, 102 S. Ct. 1974, 72 L. Ed. 2d 443 (1982). He misconstrues *Narel,* which was an Interstate Detainer Agreement case. A close examination of *Narel* discloses that when speaking to the duty of custodians to comply with the procedural requirements of the detainer (IAD) agreement, we said: *"In this regard,* custodial officials in the asylum and the charging states are viewed as agents for each other." (Emphasis added.) *Narel* v. *Liburdi,* supra, 572. In a later case, we said that "officials of the custodial state act as agents of the demanding state for purposes of the IAD [Interstate Agreement on Detainers]." *State* v. *Braswell,* 194 Conn. 297, 305, 481 A.2d 413 (1984).

[12] In any event, even if he could overcome this equal protection obstacle, the rational basis standard, and not the compelling state interest standard, would be applicable. We perceive no fundamental right requiring that this nonindigent petitioner be credited with his Florida confinement time while awaiting extradition. See *Pernell* v. *Rose,* 486 F.2d 301 (6th Cir. 1973), cert. denied, 415 U.S. 985, 94 S. Ct. 1581, 39 L. Ed. 2d 882 (1974); *State* v. *Abbott,* 617 S.W.2d 172 (Tenn. Crim. App. 1981). There is no invidious classification involved. The credit sought by the petitioner under § 18-98, statutorily created, is a matter of legislative grace. Equal protection of the laws means "that no person or class of persons shall be denied the same protection of

The petitioner next claims that the denial of his entitlement under § 18-98 of his Florida confinement time on his subsequent Connecticut sentence deprives him. of his due process rights under the fourteenth amendment to the United States constitution. This claim, although articulated as two-pronged, is actually intertwined. He claims first that such a denial operates as an unconstitutional chill to the assertion of his fundamental right to contest extradition by habeas corpus and, second, that it unconstitutionally punishes him for doing so by effectively lengthening the subsequent sentence imposed upon him for the crime for which he was being extradited. We do not agree.

The constitutional analysis of the due process claims should recognize that "[t]he paramount interests underlying the extradition process are matters of federal, rather than merely local, concern . . . . 'The scheme

---

the laws which is enjoyed by other persons or other classes in the same place and under like circumstances." *Salsburg* v. *Maryland,* 346 U.S. 545, 551, 74 S. Ct. 280, 98 L. Ed. 281 (1954), quoting from *Missouri* v. *Lewis,* 101 U.S. 22, 31, 25 L. Ed. 989 (1880). While not requiring identical treatment, equal protection does require that a distinction made must have some relevance to the purpose for which the classification is made. *Baxstrom* v. *Herold,* 383 U.S. 107, 112, 86 S. Ct. 760, 15 L. Ed. 2d 620 (1966). We have explained the rational basis test thusly: "The classifications must be reasonable and rest upon 'some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' *F. S. Royster Guano Co.* v. *Virginia,* 253 U.S. 412, 415, 40 S. Ct. 560, 64 L. Ed. 989 [1920]." *United Illuminating Co.* v. *New Haven,* 179 Conn. 627, 636, 427 A.2d 830, appeal dismissed, 449 U.S. 801, 101 S. Ct. 45, 66 L. Ed. 2d 5 (1980); see also *Frazier* v. *Manson,* 176 Conn. 638, 645, 410 A.2d 475 (1979). General Statutes § 18-98 satisfies such a test. The classification it makes is between those persons who are confined within the control of the Connecticut correctional system and those who are not. As to the former, the appropriate Connecticut authorities have control over where they are, their availability for such matters as trials, hearings, release, and the like, and from their control emerges their responsibility for them. As to the latter, Connecticut has no such control. This legislative classification has a fair and substantial relation to the object of § 18-98; it entitles those who do come within its ambit to receive credit for their Connecticut-controlled confinement "while awaiting trial." See

of interstate rendition, as set forth in both the Constitution and the statutes which Congress has enacted to implement the Constitution, contemplates the prompt return of a fugitive from justice as soon as the state from which he fled demands him . . . . ' *Sweeney* v. *Woodall,* 344 U.S. 86, 89–90, 73 S. Ct. 139, 140–141, 97 L. Ed. 114, 118 (1952) (footnotes omitted)." *DeGenna* v. *Grasso,* 413 F. Sup. 427, 431 (D. Conn.), aff'd sub nom. *Carino* v. *Grasso,* 426 U.S. 913, 96 S. Ct. 2617, 49 L. Ed. 2d 368 (1976); see *County of Monroe* v. *Florida,* 678 F.2d 1124, 1128 (2d Cir. 1982); 35 C.J.S., Extradition § 2 (1960). It is, however, beyond cavil that "[o]ne arrested and held as a fugitive from justice is entitled, of right, upon *habeas corpus,* to question the lawfulness of his arrest and imprisonment, showing by competent evidence, as a ground for his release, that he was not, within the meaning of the Constitution and the laws of the United States, a fugitive from the justice of the demanding state, and thereby overcoming

---

*McGinnis* v. *Royster,* 410 U.S. 263, 93 S. Ct. 1055, 35 L. Ed. 2d 282 (1973). This certainly rationally advances the legitimate state interest of authorizing credit to those so held when the respondent commissioner has determined that a person so confined has "conformed to the rules of the institution" in which he is confined.

We also note that the United States Supreme Court has held that a state statute that provides for an enhanced penalty if the perpetrator left the state did not violate the equal protection clause of the fourteenth amendment. See *Jones* v. *Helms,* 452 U.S. 412, 101 S. Ct. 2434, 69 L. Ed. 2d 118 (1981). There the court stated that "[d]espite the fundamental nature of this right [to travel], there nonetheless are situations in which a State may prevent a citizen from leaving. Most obvious is the case in which a person has been convicted of a crime within a State. He may be detained within that State, and returned to it if he is found in another State. Indeed, even before trial or conviction, probable cause may justify an arrest and subsequent temporary detention. Similarly, a person who commits a crime in a State and leaves the State before arrest or conviction may be extradited following 'a summary and mandatory executive proceeding.' [*Michigan* v. *Doran,* 439 U.S. 282, 288, 99 S. Ct. 530, 58 L. Ed. 2d 521 (1978).] . . . We are aware of nothing in our prior cases or in the language of the Federal Constitution that suggests that a person who has committed an offense punishable by imprisonment has an unqualified federal right to leave the jurisdiction prior to arrest or conviction." *Jones* v. *Helms,* supra, 419–20.

the presumption to the contrary arising from the face of an extradition warrant." *Illinois ex rel. McNichols v. Pease,* 207 U.S. 100, 109, 28 S. Ct. 58, 52 L. Ed. 121 (1907); *Roberts* v. *Reilly,* supra, 93; see *Barrila* v. *Blake,* 190 Conn. 631, 635, 461 A.2d 1375 (1983); *Farrell* v. *Hawley, Sheriff,* 78 Conn. 150, 153, 61 A. 502 (1905), citing General Statutes (1902 Rev.) § 1567. Our extradition statutes codify this right to apply for a writ of habeas corpus. See General Statutes § 54-166. The Florida statutes do likewise.

There is no question but that the petitioner was timely informed of this right in Florida and that he elected not to waive extradition and instead chose to apply for the writ. Florida Stat. Annot. § 941.26 (West 1973); see General Statutes § 54-181. Given these circumstances, the issue emerges whether the failure to credit his later Connecticut sentence operates to violate his due process rights by chilling unconstitutionally the assertion of the right to contest extradition or, alternatively, by punishing the petitioner for doing so. We think not.

As a general proposition, rights guaranteed by federal or state constitutions may be waived. *Singer* v. *United States,* 380 U.S. 24, 34, 85 S. Ct. 783, 13 L. Ed. 2d 630 (1965); *Johnson* v. *Zerbst,* 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938); *State* v. *Shockley,* 188 Conn. 697, 706, 453 A.2d 441 (1982); see 28 Am. Jur. 2d, Estoppel and Waiver § 163 (1966). The same observation applies to statutory rights. See *McClain* v. *Manson,* 183 Conn. 418, 439 A.2d 430 (1981); 28 Am. Jur. 2d, supra, § 164. Significantly, the Connecticut extradition statute, as well as the Uniform Extradition Act, expressly provides that a person who can be extradited may waive extradition proceedings in the asylum state. See General Statutes § 54-181 and Uniform Criminal Extradition Act § 25-A.

This petitioner, as was his right, elected not to waive but to contest extradition. The record discloses that the decision was not an uncounseled one as the Florida court appointed a public defender to assist him with his defense to extradition. We join, as we must, in the petitioner's citation of *Goodwin* for the proposition that he is not to be punished for his election and specifically where the United States Supreme Court says in that case: "To punish a person [such as this petitioner] because he has done what the law plainly allows him to do is a due process violation 'of the most basic sort.' *Bordenkircher* v. *Hayes,* 434 U.S. 357, 363, [98 S. Ct. 663, 54 L. Ed. 2d 604 (1978)] . . . . For while an individual certainly may be penalized for violating the law, he just as certainly may not be punished for exercising a protected statutory or constitutional right." *United States* v. *Goodwin,* 457 U.S. 368, 372, 102 S. Ct. 2485, 73 L. Ed. 2d 74 (1982).[13] This record contains no hard evidence of any vindictiveness, retaliation or punishment directed to the respondent in refusing the requested credit. As we have already pointed out, the plain statutory command of § 18-98 is that the requested credit cannot be given.[14] It seems to us that vindictiveness or punishment in this context cannot be defined as broadly as to include the respondent's denial of credit under § 18-98 where the plain language and statutory construction require that it be denied. Rather, in the

---

[13] In *United States* v. *Goodwin,* 457 U.S. 368, 102 S. Ct. 2485, 73 L. Ed. 2d 74 (1982), the United States Supreme Court held that the fact that the defendant was charged with a felony after refusing to plead to misdemeanor charges did not warrant a presumption of prosecutorial vindictiveness in violation of due process.

[14] We note that in 1980 the General Assembly enacted what is now General Statutes § 18-98d in which it authorized credits, under that statute, for "[a]ny person who is confined to a community correctional center *or a correctional institution* for an offense committed on or after July 1, 1981 . . . . " Despite the opportunity to do so, the legislature did not at that time include any language that suggested it was to be applied to a person confined outside Connecticut who was contesting extradition to this state.

present context, we would consider such items as being unconstitutionally administered where the credit is denied for purpose of retaliating against the petitioner simply because he exercised his legal rights. Certainly it is anomalous to argue that the commissioner is violating due process because he has performed his obligation under the statute; nor is the commissioner, in doing so, "punishing" the petitioner. See *United States* v. *Goodwin,* supra. There is "punishment" that is legally permissible and there is "punishment" that is not. See, e.g., *Bell* v. *Wolfish,* 441 U.S. 520, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979); *Roque* v. *Warden,* 181 Conn. 85, 434 A.2d 348 (1980). For example, in *Forester* v. *California Adult Authority,* 510 F.2d 58, 61 (8th Cir. 1975), the conditioning of parole upon execution of an extradition waiver was held to be not per se coercive and did not invalidate extradition waiver. Additionally, we have not been directed by the petitioner to evidence adduced which shows that the commissioner has in fact extended to one in similar circumstances the credit he now claims under § 18-98.

Furthermore, the petitioner chose to resist extradition.[15] Recognizing that while there is a governmen-

---

[15] Both the federal and Connecticut constitutions provide that the "privilege[s] of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the Public Safety may require it." U.S. Const., art. I § 9, cl. 2; Conn. Const., art. I § 12. The "no suspension" clauses prohibit only those governmental acts during non-emergency times that "suspend" the writ, "that is, the right to the writ, the privilege of having it issued, and the case heard and determined, shall not be suspended." *Macready* v. *Wilcox,* 33 Conn. 321, 329 (1866); see *Wangsness* v. *McAlpine,* 46 S.D. 75, 190 N.W. 883 (1922). Obviously, such was not the case here, although reasonable restrictions on the application for relief under a writ have been upheld. See, e.g., *United States* v. *Hayman,* 342 U.S. 205, 72 S. Ct. 263, 96 L. Ed. 232 (1952); *Grego* v. *Sheriff,* 94 Nev. 48, 574 P.2d 275 (1978). In any event, one should not misconstrue the focus of the issue in this context. The problem is not one involving any suspension of the availability of an *application* for a writ of habeas corpus but rather whether the legislative enactment, § 18-98, provides for the credit the petitioner seeks.

tally imposed choice of whether to waive or not to waive extradition, we note that it is also clear that the United States constitution does not forbid "every government-imposed choice in the criminal process that has the effect of discouraging the exercise of constitutional rights." *Chaffin* v. *Stynchcombe,* 412 U.S. 17, 30, 93 S. Ct. 1977, 36 L. Ed. 2d 714 (1973). "The criminal process, like the rest of the legal system, is replete with situations requiring 'the making of difficult judgments' as to which course to follow." *McGautha* v. *California,* 402 U.S. 183, 213, 91 S. Ct. 1454, 28 L. Ed. 2d 711 (1971), vacated sub nom. *Crampton* v. *Ohio,* 408 U.S. 941, 92 S. Ct. 2873, 33 L. Ed. 2d 765 (1972) (death penalty), citing *McMann* v. *Richardson,* 397 U.S. 759, 769, 90 S. Ct. 1441, 25 L. Ed. 2d 763 (1970). The *McGautha* court said: "Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose. The threshold question is whether compelling the election impairs to an appreciable extent any of the policies behind the rights involved." *McGautha* v. *California,* supra. Analyzing the petitioner's claim in this context causes us to conclude that his due process rights were not violated as claimed. Given, inter alia, the narrowness of the permissible inquiry in the habeas corpus hearing in Florida; see *Michigan* v. *Doran,* 439 U.S. 282, 289, 99 S. Ct. 530, 58 L. Ed. 2d 521 (1978); *Parks* v. *Bourbeau,* 193 Conn. 270, 275, 477 A.2d 636 (1984); the plain command of § 18-98 that no credit can be given to one in the petitioner's circumstances, and the absence of any legitimate basis suggesting any interdicted vindictiveness, punishment or the like for the choice exercised, we find no due process violation under either the federal or state constitution.

"Due process of law is not a rigid or static expression. It is a concept of what is fundamentally just, fair

and right, and the courts, in determining whether the constitutional demands of due process have been met and satisfied in any particular case, must decide the question on the facts of that case." *People* v. *Colozzo,* 54 Misc. 2d 687, 691, 283 N.Y.S.2d 409 (1967), aff'd, 32 App. Div. 2d 927, 303 N.Y.S.2d 348 (1969). Due process "does not protect against all deprivations of liberty. It protects only against deprivations of liberty accomplished 'without due process of law.' " *Baker* v. *McCollan,* 443 U.S. 137, 145, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979). "To be deprived of liberty 'without due process of law' means to be deprived of liberty without authority of the law." *Palmer* v. *Hall,* 380 F. Sup. 120, 133 (M.D. Ga. 1974), modified, 517 F.2d 705 (5th Cir. 1975). The commissioner's denial of the time credit sought by the petitioner under § 18-98 did not deny him due process of law as claimed.

There is error, the judgment is vacated and the case is remanded with direction to dismiss the petitioner's writ.

In this opinion PARSKEY and DANNEHY, Js., concurred.

SHEA, J., with whom SATTER, J., joins, dissenting. I disagree with the conclusion of the majority that the petitioner is not entitled to the credit provided by General Statutes § 18-98 for the time he spent in a Florida prison until conclusion of his extradition proceeding. In my view this difference in treatment accorded to those who contest extradition as compared to other prisoners who are incarcerated prior to sentence is a denial of "equal protection of the laws" that is prohibited by amendment XIV, § 1, of our federal constitution as well as article first, § 20, of our state constitution. The discrimination sanctioned by the majority cannot be justified on any rational basis and thus fails a criterion essential to the validity of any clas-

sification. See *Keogh* v. *Bridgeport,* 187 Conn. 53, 66, 444 A.2d 225 (1982); Tribe, American Constitutional Law § 16-2, pp. 994–95. It also impinges upon the free exercise of the fundamental constitutional right to challenge the legality of a person's confinement by habeas corpus and operates principally upon a suspect class composed of those prisoners too indigent to provide bail during the pendency of the extradition proceeding. These impacts upon basic constitutional rights can be justified only by a demonstration that the classification approved by the majority opinion is necessary to meet a compelling state interest, the most difficult hurdle to surmount in the face of an equal protection challenge. *Keogh* v. *Bridgeport,* supra, 66; *Leech* v. *Veterans' Bonus Division Appeals Board,* 179 Conn. 311, 313–15, 426 A.2d 289 (1979). No contention has been made, either by the state or the majority, that this exalted criterion for constitutional validity, if applicable, has been satisfied by the record in this case.

The interpretation of § 18-98 adopted by the opinion denying credit for time served while awaiting extradition is undeniably consistent with the language of the statute that authorizes commutation of a defendant's sentence "by the number of days *which he spent in a community correctional center"* and that requires a certification of such commutation by "the supervising officer of *the correctional center where such person was confined* while awaiting trial . . . ." (Emphasis added.) The opinion purports to follow strictly the language restricting the commutation to time served "in a community correctional center," as defined in General Statutes § 1-1 (w) to include only the jails in Bridgeport, Brooklyn, Haddam, Hartford, Litchfield, New Haven and Montville, as well as certain portions of the Connecticut Correctional Institution in Niantic. At the same time the opinion in footnote nine sanctions several acknowledged departures from the literal require-

ments of the statute. Prisoners who are transferred by the commissioner pursuant to § 18-86 from a community correctional center or other correctional facility while waiting trial to any other institution or facility of the department of correction continue to earn a commutation of their sentences under § 18-98. Those who are transferred to penal institutions outside Connecticut pursuant to the New England Interstate Corrections Compact, General Statutes § 18-102, are similarly allowed to receive credit under § 18-98 for the time spent in such confinement. Defendants who are transferred to mental institutions for the purpose of competency examinations pursuant to General Statutes § 54-56d are also entitled to this credit.[1] Even those who, like this defendant, are extradited from another state are given this allowance for the time spent in confinement while awaiting transportation to this state after extradition has been ordered by the asylum state.

Thus, in approving these deviations from the strict language of the statute, the opinion recognizes the problem of an unconstitutional denial of equal protection of the laws that would arise if the credit for time served under § 18-98 were limited to "the number of days . . . spent in a community correctional center" as the statutory language literally commands. Despite standard imprecations about ascertaining the legislative intention "from the language of the statute itself,

---

[1] General Statutes § 54-56d (r) provides in reference to persons who are confined in mental institutions awaiting determination of their competency to stand trial in a pending criminal case as follows: "Actual time spent in confinement on an inpatient basis pursuant to this section shall be credited against any sentence imposed on the defendant in the pending criminal case or in any other case arising out of the same conduct in the same manner as time is credited for time spent in a correctional facility awaiting trial."

This provision became effective on October 1, 1981, more than a year after this defendant had been sentenced. The record in this case does not indicate whether prior to its enactment the commissioner's practice was to allow such a credit for time spent in a mental institution awaiting a competency determination.

if the language is plain and unambiguous," the majority opinion in fact has given an expansive reading to the terms of § 18-98 in order to accommodate long-standing practices of the commissioner which forestall equal protection claims that would otherwise be raised by prisoners denied the credit for time served prior to sentence, not in a community correctional center, as § 18-98 appears to dictate, but elsewhere.

I

The issue then is not whether we must adhere to the plain language of § 18-98, which limits commutation to time served in a community correctional center, but whether judicial embellishment of the statute to allow the same credit to several categories of prisoners for confinement outside a community correctional center should exclude those, like the defendant, who seek to exercise the right to contest extradition. The majority seems to rely upon two grounds as constituting a "rational basis" for treating these prisoners differently: (1) that until extradition has been ordered by the asylum state these prisoners are not "confined while awaiting trial," as § 18-98 is claimed to require; and (2) that, prior to the extradition order, they are not subject to the control or jurisdiction of this state.

From the viewpoint of syntax, the "while awaiting trial" clause in the second sentence of § 18-98 is part of the designation of the particular correctional center whose supervising officer must certify the number of days during which a prisoner "was confined between the denial of bail to him or his inability to obtain bail and his imprisonment." No such qualification appears in the first sentence, which provides for a commutation "by the number of days which [a prisoner] spent in a community correctional center from the time he was denied or was unable to obtain bail to the time he was so imprisoned." In any event, it is difficult to per-

ceive any rational basis for distinguishing prisoners awaiting a trial to follow completion of an extradition proceeding from those awaiting a trial which cannot take place until completion of a competency hearing, discovery procedures, indictment by a grand jury, or countless other preliminaries to an actual trial. From the inside, all jails look alike; and when a person is confined during the period necessary for disposition of a criminal charge, time passes no more swiftly awaiting the resolution of one step of the process than another.

The second basis proposed for excluding time served out of state prior to an extradition order from the commutation allowance under § 18-98 is equally nebulous. The majority argues that because the equal protection clause merely forbids a state to "deny to any person *within its jurisdiction* the equal protection of the law," such a denial is permissible here because the jail time for which the petitioner seeks credit was served in a Florida prison, outside the jurisdiction of this state. Neither our federal nor our state constitutional protections against nonsensical discrimination can be so cavalierly read. A state may not favor its own residents over others unless the discrimination bears a rational relationship to a legitimate state purpose. *Metropolitan Life Ins. Co.* v. *Ward,*    U.S.    , 105 S. Ct. 1676, 1680, 84 L. Ed. 2d 751, reh. denied,    U.S.    , 105 S. Ct. 2370, 86 L. Ed. 2d 269 (1985); *Western & Southern Life Ins. Co.* v. *State Board of Equalization of California,* 451 U.S. 648, 667–68, 101 S. Ct. 2070, 68 L. Ed. 2d 514 (1981). Although it may be true that a state's equal protection obligations "can be performed only where its laws operate, that is, within its own jurisdiction"; *Missouri ex. rel. Gaines* v. *Canada,* 305 U.S. 337, 350, 59 S. Ct. 232, 83 L. Ed. 208 (1938); the denial of equal protection in this case occurred while the petitioner was in this state at the time of sentencing when the time he served in Florida was not credited.

It is undisputed that the petitioner was held in Florida solely at the behest of this state for the purpose of responding to a criminal charge in this state. The officials in Florida who arrested and confined him were acting entirely on behalf of this state. The scope of judicial inquiry at an extradition hearing is limited to the narrow issues of "(a) whether the extradition documents on their face are in order, (b) whether [the plaintiff] has been charged with a crime in the demanding state, (c) whether [the plaintiff] is the person named in the request for extradition; and (d) whether [the plaintiff] is a fugitive." *Cuyler* v. *Adams,* 449 U.S. 433, 443 n.11, 101 S. Ct. 703, 66 L. Ed. 2d 641 (1981), quoting *Michigan* v. *Doran,* 439 U.S. 282, 289, 99 S. Ct. 530, 58 L. Ed. 2d 521 (1978). We have recognized that, with respect to detainers, "custodial officials in the asylum and the charging states are viewed as agents for each other." *Narel* v. *Liburdi,* 185 Conn. 562, 572, 441 A.2d 177 (1981), cert. denied, 456 U.S. 928, 102 S. Ct. 1974, 72 L. Ed. 2d 443 (1982); see *State* v. *Braswell,* 194 Conn. 297, 305, 481 A.2d 413 (1984). Although extradition is not entirely analogous to the detainer situation, for the purpose of determining whether time served solely as a result of a criminal proceeding instituted in this state should be credited in accordance with § 18-98, the period of confinement in the custody of Florida jail officials should be treated no differently from that served in this and other states under similar circumstances. The majority apparently approves such a credit for prisoners held for trial on Connecticut charges in jails of other states pursuant to General Statutes § 18-102 on the basis of a provision in Art. IV (c) that such persons "shall at all times be subject to the jurisdiction of the sending state." In the real world this petitioner was to the same extent subject to the jurisdiction of this state while he was held in Florida, because, despite his right to a narrow inquiry into the legitimacy of the demand for his extradition,

his incarceration was similarly within the control of this state, subject to continuance or termination solely at its command.

## II

The preceding discussion has considered the denial of credit for time served while awaiting extradition wholly in terms of the standard "rational basis" test for denials of equal protection of the laws. The nature of the right of a prisoner to an extradition hearing pursuant to a writ of habeas corpus for the purpose of determining the legality of his confinement and impending transportation to the demanding state to answer criminal charges, however, implicates constitutional values sufficiently exalted in the hierarchy of individual protections to warrant application of a more demanding test to justify any infringement thereof.

The power of a state to bring before its courts a person found in another state to respond to a criminal charge is founded on article IV, § 2, ¶ 2, of our federal constitution, which mandates that, upon a lawful demand of the executive authority, a fugitive must "be delivered up, to be removed to the State having Jurisdiction of the Crime." Under federal statutes implementing this constitutional provision, a prisoner "is entitled to invoke the judgment of the judicial tribunals, whether of the State or the United States, by writ of *habeas corpus,* upon the lawfulness of his arrest and imprisonment." *Roberts* v. *Reilly,* 116 U.S. 80, 94, 6 S. Ct. 291, 29 L. Ed. 544 (1885). "One arrested and held as a fugitive from justice is entitled, of right, upon *habeas corpus* to question the lawfulness of his arrest and imprisonment . . . . " *McNichols* v. *Pease,* 207 U.S. 100, 109, 28 S. Ct. 58, 52 L. Ed. 121 (1907). "It must never be forgotten that the writ of *habeas corpus* is the precious safeguard of personal liberty and there is no higher duty than to maintain it unimpaired."

*Bowen* v. *Johnston,* 306 U.S. 19, 26, 59 S. Ct. 442, 83 L. Ed. 455 (1939). Although certain procedural aspects of the writ may be modified, any alternative remedy must be fully equivalent to habeas corpus "by affording the same rights in another and more convenient form." *United States* v. *Hayman,* 342 U.S. 205, 219, 72 S. Ct. 263, 96 L. Ed. 232 (1952). The privilege of the writ of habeas corpus is expressly protected against suspension by article I, § 9, ¶ 2, of our federal constitution. It is thus one of the "privileges or immunities of citizens of the United States" which no state may abridge under § 1 of the fourteenth amendment to the United States constitution.

Since the essential issue in a habeas corpus proceeding, such as an extradition hearing, is the legality of the petitioner's confinement, it follows that nothing less than the fundamental constitutional right of liberty is at stake in such an inquiry. Where a legislative classification impinges upon such a fundamental right it must be struck down unless justified by a compelling state interest. *Laden* v. *Warden,* 169 Conn. 540, 542, 363 A.2d 1063 (1975). "The refusal to credit the plaintiff with jail time affects the period of his confinement and directly impinges on his fundamental right of liberty." Id., 544. It is beyond cavil that the different treatment under § 18-98 accorded those who seek to contest extradition must inevitably operate to discourage the free exercise of that constitutional right, because such prisoners earn no commutation for the time spent in confinement, *in this case 104 days,* until the determination of the legality of the extradition. Only by waiving extradition could the petitioner begin to accumulate time served that would be applied upon his sentence.

The question then arises of what compelling interest the state has shown to support this evident infringement upon the exercise of the right of habeas corpus

by a prisoner to determine the legality of the deprivation of his liberty. The majority refers to no state interest that is advanced by the discrimination it has
sanctioned. It is obvious, of course, that the progress
of many criminal cases would be significantly expedited
if extradition were waived and thus the resources of
the state might be conserved. Such considerations do
not weigh heavily when balanced against the inhibition
of the free exercise of such a fundamental constitutional
right as habeas corpus that the majority sanctions by
effectively barring those who invoke that constitutional
privilege in an extradition proceeding from receiving
credit for time served pursuant to § 18-98. See *Plyler*
v. *Doe,* 457 U.S. 202, 229, 102 S. Ct. 2382, 72 L. Ed.
2d 786, reh. denied, 458 U.S. 1131, 103 S. Ct. 14, 73
L. Ed. 2d 1401 (1982). Commendably, the majority
opinion does not suggest that conservation of the taxpayer's dollar by inducing fugitives to waive extradition as even a rational basis for the classification it
supports.

"To punish a person because he has done what the
law plainly allows him to do is a due process violation
'of the most basic sort.' " *United States* v. *Goodwin,*
457 U.S. 368, 372, 102 S. Ct. 2485, 73 L. Ed. 2d 74
(1982), quoting in part *Bordenkircher* v. *Hayes,* 434
U.S. 357, 363, 98 S. Ct. 663, 54 L. Ed. 2d 604, reh.
denied, 435 U.S. 918, 98 S. Ct. 1477, 55 L. Ed. 2d 511
(1978). The opinion acknowledges this principle but
finds it inapplicable because of the absence of any "hard
evidence of any vindictiveness, retaliation or punishment directed to the respondent in refusing the
requested credit" and because "the plain statutory command of § 18-98 is that the requested credit cannot be
given." The prohibition against punishment for exercising a protected statutory or constitutional right
cannot be circumvented by the lack of improper motivation on the part of those responsible for administer-

ing a provision challenged because it operates to deny a statutory benefit to a discrete class who seek to exercise a fundamental constitutional right. See *United States* v. *Jackson,* 390 U.S. 570, 582–83, 88 S. Ct. 1209, 20 L. Ed. 2d 138 (1968). Despite the "plain statutory command of § 18-98," the majority approves the practices of the commissioner in extending the credit for pretrial confinement to all prisoners except those, like the petitioner, who choose to contest extradition. This exclusion must be viewed as a penalty upon the free exercise of that fundamental right in the absence of a demonstration that significant state interests justify different treatment of those who contest extradition.

### III

The majority opinion does not consider the equal protection problem that its view of § 18-98 creates for those who are unable because of indigency to post the amount of bail set by the court of the asylum state during the pendency of the extradition proceeding. Although the petitioner does not fall into this class because his incarceration during extradition resulted from a denial of bail rather than from his inability to provide bail, the ramifications of the restricted interpretation of the statute adopted by the opinion must be fully explored despite the inability of this petitioner to claim an equal protection violation in his own behalf. The construction of the statute now adopted is not likely to be altered when another petitioner comes before us who is qualified to raise the claim which the opinion puts aside. See *Seals* v. *Hickey,* 186 Conn. 337, 356, 441 A.2d 604 (1982) (*Shea, J.,* dissenting).

Not all those who contest extradition are deprived by the majority of the credit for time served while extradition is pending, because those who have sufficient financial resources may gain their freedom by providing bail where the court has set an amount. Those

who are able to exercise this privilege, of course, would earn no time to be credited under § 18-98 in any event, regardless of the restriction placed upon its availability by the opinion. Where bail has been made accessible, therefore, the entire burden of the denial by the opinion of commutation for time served during extradition is borne by those too poor to make bail. The affluent may contest extradition without being similarly penalized.

Although we have not yet arrived at the time when all discriminations between rich and poor in the administration of our criminal justice system are prohibited, any difference in treatment based upon financial ability must be closely scrutinized to meet constitutional requirements. "In criminal trials a State can no more discriminate on account of poverty than on account of religion, race, or color." *Griffin* v. *Illinois,* 351 U.S. 12, 17, 76 S. Ct. 585, 100 L. Ed. 891 (1956). This principle is applicable to extradition as well, because the effect of denying commutation credit to those who cannot post bail during the pendency of the proceeding is to require that they serve more time than those who are financially able to gain their release during that period of time. Just as it is impermissible to incarcerate a person whose indigency makes it impossible to pay a fine that has been imposed; *Tate* v. *Short,* 401 U.S. 395, 399, 91 S. Ct. 668, 28 L. Ed. 2d 130 (1971); any differences in the effective length of a sentence resulting from differences in financial resources cannot be justified. See *Williams* v. *Illinois,* 399 U.S. 235, 243–45, 90 S. Ct. 2018, 26 L. Ed. 2d 586 (1970). The inability to make bail before trial has been held to preclude the imposition of the maximum sentence provided for a crime unless credit is given for all pre-sentence jail time. *Jackson* v. *Alabama,* 530 F.2d 1231, 1235 (5th Cir. 1976); *Hill* v. *Wainwright,* 465 F.2d 414, 415 (5th Cir. 1972); *Hart* v. *Henderson,* 449 F.2d 183 (5th Cir.

1971). "[O]nce the State has defined the outer limits of incarceration necessary to satisfy its penological interests and policies, it may not then subject a certain class of convicted defendants to a period of imprisonment beyond the statutory maximum solely by reason of their indigency." *Williams* v. *Illinois,* supra, 241–42. This court also has declared that "statutes violate the due process clause of the fourteenth amendment to the United States constitution where they operate to lengthen the time a prisoner must serve in confinement beyond the maximum authorized by statute." *Laden* v. *Warden,* supra, 544 n.3.

The view of § 18-98 taken by the majority would clearly violate *Williams* in the case of a person who received a maximum sentence for an offense, unless the time served during extradition effectuated a corresponding reduction in sentence. *Williams* requires that this subclass of extradited offenders be given credit for time served outside the boundaries of this state, regardless of the limitation the opinion purports to uphold that the § 18-98 credit is applicable only to pretrial detention within our borders. This subclassification creates an additional equal protection problem in that the availability of the credit to only those extradited prisoners who receive maximum sentences, presumably the worst offenders, is impossible to justify on any rational basis.

In *Laden* v. *Warden,* supra, we recognized that even the interest of the state in maintaining prison discipline could not support a deprivation of credit for time served prior to sentence under § 18-98 where the impact of the disciplinary rule was borne only by those unable to post bail because of indigency. Similarly, in *Moscone* v. *Manson,* 185 Conn. 124, 440 A.2d 848 (1981), we rejected "a literal reading" of General Statutes § 53a-38 that would have placed it "in constitutional jeopardy" because of its discriminatory effect in rela-

tion to the calculation of "good time credits" upon indigent prisoners who remained incarcerated during the pendency of appeals from their convictions in the trial court. The majority offers no rationale for treating differently the denial of credit for jail time pending extradition, the impact of which is also not shared by those with sufficient finances to be released on bail during the proceeding.

It is incomprehensible, therefore, that the majority has chosen to disregard the administrative directive issued by the commissioner in 1976 providing that presentence jail time credit under § 18-98 should be applied to all sentences "regardless of where served." We have frequently held that the interpretation of a statute by the agency charged with enforcing it is entitled to substantial weight in its construction. *State* v. *Sober,* 166 Conn. 81, 90, 347 A.2d 61 (1974). This principle warrants special consideration here. The lay perception of "equal justice before the law" embodied in this regulation undoubtedly reflects the practical wisdom of the commissioner that prisoners should be treated equally in regard to credit for time served in order to remove any basis for complaints of disparity that often create prison discipline problems. While we in our ivory tower, far removed from the turmoil, may rely upon abstruse concepts of "jurisdiction" to justify what lay persons perceive as unequal treatment, the commissioner must daily confront the consequences of our determination in the form of disgruntled prisoners citing others who spend less actual time in confinement under sentences of the same duration.

I believe that we should join those courts that have construed jail time credit statutes containing restrictive language similar to that of § 18-98 to afford credit for time spent in confinement prior to sentence regardless of where the prisoner is held. See *United States* v. *Harvey,* 711 F.2d 113 (8th Cir. 1983); *Ballard* v.

*Blackwell,* 449 F.2d 868, 869 (5th Cir. 1971); *Zulla* v. *Florida,* 404 So. 2d 202, 203 (Fla. App. 1981); *Nutt* v. *State,* 451 N.E.2d 342, 345 (Ind. App. 1983); *People* v. *Havey,* 11 Mich. App. 69, 160 N.W.2d 629 (1968); *People* v. *Nagler,* 21 App. Div. 2d 490, 494, 251 N.Y.S.2d 107 (1964). Accordingly, I would find no error in the judgment of the trial court awarding the credit sought by the petitioner.

been caused by the intoxication of a person to whom the defendants served alcoholic liquor while intoxicated, brought to the Superior Court in the judicial district of Middlesex at Middletown and tried to the jury before *Higgins, J.;* verdict for the plaintiffs and, after the action by the named plaintiff was withdrawn, judgment for the plaintiff Charles L. Dickinson in the amount of $20,000, from which judgment the plaintiff Charles L. Dickinson appealed and the named defendant cross appealed to this court.