[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION PROCEDURAL HISTORY
This case is an appeal by plaintiffs taken pursuant to Conn. Gen. Stats. 12-422 contesting a determination under Conn. Gen. Stats. 12-420 and 12-425 of the defendant Commissioner of Revenue Services (Commissioner) to assess plaintiff AirKaman, Inc. (AirKaman) sales and use tax in the amount of $42,050.00 plus interest for the period of February 1981 through December 1984 and plaintiff Combs Gates Bradley, Inc. (Combs Gates) sales and use tax in the amount of $10,133.00 plus interest for the period from January 1985 through May 1985. The assessments were made on the basis that plaintiffs were performing management services as specified in Conn. Gen. Stats. 12-407(2)(i)(J) (rev'd to January 1, 1989) and, therefore, that a taxable "sale" occurred under this section.
Statements of Proposed Assessments by the Department of Revenue Services (DRS) dated September 2, 1985, were received by plaintiffs who then protested the proposed assessments pursuant to Conn. Gen. Stats. 12-421 by letter dated CT Page 2940 September 24, 1985. A hearing was held before the DRS on January 7, 1986. The decision of the hearing officer was received by plaintiffs by letter dated October 27, 1986. The assessments became final on November 26, 1986. Both AirKaman and Combs Gates subsequently made payments of the tax and interest assessed and filed claims for refunds on April 29, 1987. The claims for refunds were denied on May 6, 1987 and the plaintiffs filed this appeal on May 29, 1987.
FACTS
The following is a summary of the facts that are contained in a Stipulation of Facts filed with the court.
On September 25, 1969, Uniroyal, Inc. (Uniroyal), a New Jersey corporation qualified to do business in the State of Connecticut, entered into a lease with the State for the fixed base operation of the Oxford Airport. The lease covered the period beginning November 1, 1969, and ending October 31, 1989. The Oxford Airport was the only facility that Uniroyal had under lease during the period February 1982 through October 1985. Under the lease, Uniroyal was permitted to assign or delegate the agreement or to sublet the premises with the written approval of the State.
In December 1981, Uniroyal entered into a sublease with AirKaman, Inc., a Connecticut Corporation, covering the period December 1981 through December 1984. Under Section 1 of the sublease, AirKaman was required to operate Uniroyal's fixed base operation. Under Section 4 of the sublease, AirKaman was to be paid $650.00 per week plus 40% of the net income from the operation. In addition, AirKaman was to receive reimbursement for all costs incurred in connection with the fixed base operation.
In December 1984, Uniroyal entered into a sublease with Combs Gates Bradley, Inc., a Connecticut corporation, as successor to AirKaman, covering the period January 1, 1985 through October 31, 1989. Under Section 4 of the sublease, Combs Gates was to be paid $710.00 per week plus 40% of the net income from the operation. In addition, Combs Gates was to receive reimbursement for all costs incurred in connection with the fixed base operation.
The billings of AirKaman and Combs Gates to Uniroyal consisted of charges for reimbursement for payroll and payroll expenses (payroll taxes, insurance, pension contributions); management fee (i.e. $650.00 per week for AirKaman, $710.00 per week for Combs Gates); accounting fee; payroll services fee; and reimbursement of insurance premiums. Neither AirKaman nor CT Page 2941 Combs Gates charged any sales and use tax on its billings to Uniroyal. The DRS agreed that the accounting fee, payroll service fee, and reimbursement of insurance premiums were not taxable. The DRS, however, continued to maintain that the management fee and reimbursement for payroll expenses are taxable as management services under Conn. Gen. Stats.12-407(2)(i)(J). At oral argument the DRS specifically disclaimed any right to tax under other provisions of the statute.
JURISDICTION
The Commissioner of Revenue Services is empowered by Conn. Gen. Stats. 12-35 and Conn. Gen. Stats. 12-420 to collect sales and use taxes and any penalty or interest due relating to such taxes. The Commissioner assessed the plaintiffs sales and use tax plus interest which the plaintiffs timely paid. The plaintiffs made a timely petition, i.e., "within thirty days after service . . . of notice" pursuant to Conn. Gen. Stats. 12-418, on defendant Commissioner for reassessment of the sales and use tax assessed by him. The Commissioner denied the petition. Conn. Gen. Stats. 12-422
provides in pertinent part:
 Any taxpayer aggrieved because of any order, decision, determination or disallowance of the commissioner of revenue services under Section 12-418, 12-421, or 12-425 may, within one month after service upon the taxpayer of notice of such order, . . . take an appeal therefrom to the superior court for the judicial district of Hartford-New Britain. . . .
Pursuant to 12-422 the plaintiffs are aggrieved by the disallowance of their petition for reassessment. Upon the Commissioner's denial of their petition, the plaintiffs appealed to the Superior Court pursuant to Conn. Gen. Stats.12-422. An appeal taken under 12-422 empowers the trial court to conduct the appeal de novo. Kimberly-Clark Corporation v. Dubno, 204 Conn. 137, 144-45 (1987).
The plaintiffs claim in their three-count complaint that the disallowance of their claims for refund as well as the denial of their petition for reassessment was wrongful, arbitrary and unreasonable because the services performed pursuant to the leases with Uniroyal for the operation of the Airport do not constitute "business analysis and management services" within the meaning of Conn. Gen. Stats.12-407(2)(i)(J). The plaintiffs also claim that even assuming CT Page 2942 a portion of the services performed by each could be considered "business analysis and management services", the disallowance of their claims for refund, in their entirety, was wrongful, arbitrary and unreasonable because there should have been an allocation between the taxable and non-taxable services rendered. The plaintiffs' final claim is that their relationships with Uniroyal should be viewed as joint ventures and therefore any fees received by them should have been treated as a division of profits and not as enumerated services subject to sales tax.
ISSUES
The dispositive issues on this appeal are: (1) whether the meaning of the term "management services" contained in12-407(2)(i)(J) is limited solely to consulting services or includes day-to-day actual management; (2) whether the plaintiffs were performing services within this meaning; and (3) whether plaintiffs' agreements with Uniroyal were joint ventures.
It is the opinion of the court that the proper interpretation of the term management services as used in the statute is limited to consulting services, i.e., advisory services and does not include day-to-day operational management. It is further found that the plaintiffs were not performing services within this meaning. It is therefore found that the plaintiffs' appeal should be sustained. Finally, the court declined to find that the plaintiffs' relationships with Uniroyal should be regarded as joint ventures.
DISCUSSION
Conn. Gen. Stats. 12-408(1) assesses a tax on "gross receipts. . . from the rendering of any services constituting a sale in accordance with subdivision (i) of subsection (2) of section 12-407. . . ." Conn. Gen. Stats. 12-407(2) defines the term "sale", for the purposes of the Connecticut Sales and Use Tax, to include the rendering of certain enumerated services. Among those enumerated services are "business analysis and management services." Conn. Gen. Stats.12-407(2)(i)(J). The plaintiffs claim that the meaning of "management services" referenced in 12-407(2)(i)(J) is limited solely to management consulting services. The Commissioner claims that the meaning of "management services" includes day-to-day actual management and is not limited solely to consulting services.
It is found that based on statutory construction, legislative history, the regulations of the DRS, and case law, CT Page 2943 the meaning of "management services" in 12-407(2)(i)(J) is limited solely to management consulting services. Thus, although the management fee and reimbursement for payroll expenses each have the potential of separate analysis, separate analyses are not necessary because the Commissioner disclaimed the right to tax under other statutory provisions and because the court finds that plaintiffs were not performing management consulting services.
"It is a cardinal rule of construction that statutes are to be construed so that they carry out the intent of the legislature. This intent is to be ascertained from the language of the statute itself, if the language is plain and unambiguous." Hurlburt v. Lemelin, 155 Conn. 68, 73 (1967). "It is basic, of course, that a statute is to be construed as a whole and that the words used therein must be interpreted in their plain and ordinary meaning `unless the context indicates that a different one was intended.'" Johnson v. Manson,196 Conn. 309, 316 (1985) (quoting Caldor, Inc. v. Heffernan,183 Conn. 566, 570 (1981).
In 12-407(2)(i)(J) the term management services is used in conjunction with the term business analysis, and therefore reasonably connotes activities of a consultative and advisory nature and not day-to-day actual management. Consulting is defined as "providing professional or expert advice." Webster's New Collegiate Dictionary (1980). If the terms "management services" in 12-407(2)(i)(J) is given the meaning of day-to-day actual management of real property, it will be redundant since 12-407(2)(i)(I) includes such services. Section 12-407(2)(i)(I) refers to "services to industrial, commercial or income-producing real property, including but not limited to, such services as management, maintenance, janitorial, electrical. . . ." (Emphasis added). Thus, the term management in 12-407(2)(i)(I) refers to day-to-day management. See Conn. Dept. Reg. 12-426-26 (effective as of April 7, 1980). The regulation provides in pertinent part:
 (a) General Rule. Retailers engaged in the rendering of services for a consideration to existing industrial, commercial or income-producing real property in this state are subject to the tax. . . .
 (b) The list of services subject to the tax includes, but is not limited to:
 1. Management 2. Maintenance CT Page 2944 3. Janitorial 4. Electrical 5. Plumbing 6. Painting 7. Carpentry 8. Landscaping 9. Exterminating 10. Roofing 11. Siding 12. Foundation 13. Plastering 14. Heating 15. Cooling 16. Demolition 17. Pointing 18. Refuse disposal
 (e) "Commercial property" shall mean and include all real property devoted to, held or leased for commercial use or activity. Commercial use or activity includes, but is not limited to, buying, selling or leasing of goods or services, the operation of restaurants or any other activity carried on with the public for profit. Commercial and business property includes but is not limited to all ancillary buildings such as garages and warehouses.
Conn. Dept. Reg. 12-426-26.
A plausible reason for the legislature's distinguishing between management services of a consultive nature in12-407(2)(i)(J) and management services of day-to-day operation in 12-407(2)(i)(I) was to ensure that both types of service would be taxed and thus make the statute effective and workable. This interpretation of management services as used in 12-407(2)(i)(J) as meaning those of a consultive or advisory nature is also supported by the rule of statutory construction "that when two constructions are possible, courts will adopt that construction which makes the statutes effective and workable, and not one which would lead to difficult and unfathomable results." Heffernan v. Slapin, 182 Conn. 40, 48
(1980). Moreover, limiting the term management services of Conn. Gen. Stats. 12-407(2)(i)(J) to consulting services conforms to the basic rule of statutory construction that any ambiguities in a taxing statute must be resolved in favor of the taxpayer. Stone v. Sullivan, 154 Conn. 498, 503-04 (1967). CT Page 2945
It is also found that this construction is also consistent with the legislative history of the statute. During the house debate on Conn. Public Acts No. 75-213, the references to "management services" are almost exclusively in terms of "consulting firms" and "management consulting." House Debate, 18 H.R. Proc., Pt 7, 1975 Sess., pp. 3036, 3059, 3072, 3078-79, 3097. Furthermore, Representative Clynes, Chairman of the Finance Committee, when asked for a definition of the term "management services" responded that "I would say that that's an establishment primarily engaged in furnishing a wide variety of general or specialized management consulting services such as business analysts [sic], business research, efficiency, industrial management, marketing research, personal [sic] management." Id. at 3097. When Representative Clynes was then asked whether his definition included the management of real estate property he responded, "Mr. Speaker, the management of real estate properties, if they are managing it for another business and charging a fee, I would say Mr. Speaker, yes." Id. It is opined that Representative Clynes inadvertently answered that the management of real estate properties was included in the term "management services" then under discussion, since the management of real property was already included in Conn. Gen. Stats. 12-407(2)(i)(I). Further, Representative Clynes' inclusion of real property management in "management services" is inconsistent with his previous definition which is in terms of "management consulting services."
Limiting the term "management services" to consulting activities is supported by the regulations promulgated by the DRS defining "management services." The DRS Regulations provide: "Business Management services mean and include the furnishing of a wide variety of general or specialized management consulting services, such as business analysis, business research, industrial management, marketing research, and personnel management and training." Conn. Dept. Reg. 12-496-27(10)(b). The regulations further provide: "The terms `includes' when used in a definition contained in this regulation shall not be deemed to exclude other things otherwise within the meaning of the term defined." Conn. Dept. Reg. 12-496-27(b)(11)(k). Thus, the regulations define "management services" in terms of "management consulting services" and therefore the terms "management services" and "business management services" can only be deemed to include services of a consultative or advisory matter within their definitions.
"[T]he commissioner's regulatory interpretation of the statute, which he is charged with administering, is entitled to CT Page 2946 great deference and weight." Phelps Dodge Copper Products Co. v. Groppo, 204 Conn. 122, 129 (1987). The commissioner's regulation must comport with the legislative intent behind the statute. Id. at 130.
In the present case DRS Reg. 12-496 is consistent with the language of the statute and does not controvene the legislative intent behind it since the regulation tracks the definition of management services given by Representative Clynes during the house debate.
This view is further supported by case law. In Taylor Management Co. v. Dubno, D.N. 236092, J.D. of Hartford/New Britain at Hartford, Memorandum of Decision, August 18, 1981, L. Shapiro, J., State Trial Referee, acting as a trial court, stated that "the Court construes the proper interpretation of [business analysis and management services] as used in the statute as limited to consulting activities, and not the day-to-day operational supervision performed by plaintiff." Id. at 5-6. The Court also stated that "[in the statute] the term management services is used in conjunction with the term business analysis, and reasonably connotes activities of consultative and advisory nature. . . ." Id. at 6. The Court reached its conclusion after reviewing the legislative history and applying the rules of statutory construction.
It is found that the statute, the legislative history, the regulations of the DRS, and the case law interpreting the term "management services" for the purposes of the sales tax all indicate that the type of activities meant to be taxed under Conn. Gen. Stats. 12-407(2)(i)(J) are those of a consultative and advisory nature, rather than day-to-day operational or ministerial activities.
In Count Two of their complaint the plaintiffs claim "there should have been an allocation between the taxable and non-taxable services rendered." The plaintiffs, in their supplemental brief in support of this count, argue that the services performed by them to Uniroyal were a "sale for resale" to the state and therefore were exempt from the sales and use tax pursuant to Conn. Gen. Stats. 12-412. The Court need not consider the "sale and resale" issue since this case is concerned with the nontaxability of services.
Also, the "sale for resale" argument will not be considered because a claim for "an allocation between the taxable an non-taxable services" is different from a claim for a complete exemption. The Court will not consider the "sale for resale" argument because the plaintiffs were denied CT Page 2947 permission to amend their complaint to include an additional count with the "sale for resale" exception argument. Accordingly, since the matter has previously been ruled upon the Court elects to treat that decision as the law of the case. Breen v. Phelps, 186 Conn. 86, 99 (1982).
Finally, the Court will not consider the "sale for resale" argument because there is nothing in the record or stipulation of facts indicating that the plaintiffs or Uniroyal held valid sales and use tax permits under Conn. Gen. Stats.12-409 or were authorized to issue resale certificates pursuant to Conn. Gen. Stats. 12-410(2) and 12-411(10). In fact, there is no evidence of any resale certificates. Moreover, "[a]ny statute creating a tax exemption must likewise be strictly construed against the party claiming an exemption." Caldor, Inc. v. Heffernan, 183 Conn. 566, 571 (1981). Therefore, in strictly construing the sale for resale exemption against the plaintiffs, based upon the record and stipulation of facts, the plaintiffs have failed to demonstrate that the services they rendered the Uniroyal were for resale to the state.
In Count Three of their complaint plaintiffs have argued that their respective relationships with Uniroyal should be viewed as joint ventures and therefore any fees received should be treated as a division of profits. "The relationship between contracting parties cannot amount to a joint venture unless the parties so intend." Electronic Associates, Inc. v. Automatic Equipment-Development Corp., 185 Conn. 31, 35 (1981). The record, the stipulation of facts, and the plaintiffs' agreement do not indicate that AirKaman and Uniroyal, or Combs Gates and Uniroyal, ever intended or agreed to become joint venturers. It is therefore found that neither the AirKaman and Uniroyal relationship nor the Combs Gates and Uniroyal relationship can be viewed as a joint venture.
CONCLUSION
Based on the foregoing analysis, the plaintiffs' appeal is sustained.
Koletsky, J.