## LUIS ROQUE *v.* WARDEN, CONNECTICUT CORRECTIONAL INSTITUTION, SOMERS

COTTER, C. J., LOISELLE, BOGDANSKI, PETERS and HEALEY, Js.

Argued January 9—decision released June 3, 1980

*Kimball H. Hunt,* for the appellant (plaintiff).

*Stephen J. O'Neill,* assistant attorney general, with whom, on the brief, was *Carl R. Ajello,* attorney general, for the appellee (defendant).

ARTHUR H. HEALEY, J.  This is a habeas corpus proceeding instituted by the plaintiff, Luis Roque, an inmate at the Somers correctional institution, in which he challenges the constitutionality of certain procedures by which he was required to serve four days in punitive segregation and was deprived of ninety days of good time.  These sanctions were imposed as the result of his being found guilty in a prison disciplinary hearing of the charges of giving false information and attempt to commit riot, as defined in the prison disciplinary rules.  In his amended application for a writ of habeas corpus to the Superior Court, he sought the restoration of the loss of the ninety days good time, the expunging from his record of all reference to the charges, hearing and punishment and "such other relief as law and equity may provide."  The Superior Court dismissed the application for the writ and this appeal followed.[1]

On appeal, the plaintiff directs several claims of error to the court's finding.[2]  We have corrected the

---

[1] Although the judgment of the trial court "dismissed" the action for a writ of habeas corpus, technically the writ was issued and the plaintiff was brought before the court.  The relief sought in the application for the writ was denied.  See *Kearney* v. *State,* 174 Conn. 244, 249–50, 386 A.2d 223 (1978).

[2] The failure of the court to include paragraph sixteen of the draft finding in its finding has not been briefed by the plaintiff and is, therefore, deemed abandoned.  *Gigliotti* v. *Wood,* 175 Conn.

finding where warranted and note our corrections in the opinion. The finding discloses the following relevant facts: The plaintiff has been confined to the Connecticut Correctional Institution at Somers since June 1, 1973. He is serving time on a number of sentences, which result in an effective sentence of not less than twenty and not more than thirty years. These sentences result from convictions of two counts of assault with intent to murder, one count of second degree assault, one count of escape from a correctional institution and one count of escape from custody. On admission to Somers, all inmates are orientated by the presentation of a general overview of all of the activities, programs, rules and regulations of that institution. The orientation includes giving the inmates copies of the existing rules and regulations. The inmates are advised that the rules are updated from time to time and that such updates would appear on the bulletin boards and in the Weekly Scene, a newspaper published and distributed weekly to inmates at Somers. State's Exhibit C is a copy of the disciplinary rules and procedures for inmates at Somers. These rules were published in the July 6, 1974 issue of the Weekly Scene and were distributed to each inmate at Somers, including the plaintiff, that same month.

The incident generating the prison disciplinary proceedings which underlie this appeal took place on July 1, 1976, at about 2:40 p.m. The plaintiff, while returning from his work area, was stopped for

243, 247, 397 A.2d 1342 (1978); Maltbie, Conn. App. Proc. § 327. The plaintiff also failed to include in his assignment of errors any claim directed to paragraph eighty-four of the finding. See Practice Book, 1978, § 3034. His attack upon that paragraph of the finding on appeal will therefore not be considered. See Practice Book, 1978, § 3063; *Rybinski* v. *State Employees' Retirement Commission,* 173 Conn. 462, 466, 378 A.2d 547 (1977).

a routine check and search by a correctional officer. In the course of this search, seven copies of a document later admitted in evidence as plaintiff's Exhibit 1 and six copies of a document later admitted in evidence as state's Exhibit A were found on his person.

Exhibit A contains two typewritten paragraphs; the first is in English and the second is a translation of the first paragraph into Spanish. This exhibit reads in part: "The Revolutionary Coalition, which is a multiracial prisoners collective in the federal system, is calling for all prisoners in the U.S. to boycott all presentations and activities (including meals) on July 4, 1976. . . . By this boycott we hope to illustrate the contradictions between America's stated goal of freedom and its actual practice of enslavement and oppression. . . . When the prisoners stand in unity the prison doors will open. America must realize that its unhuman system must be changed, while we prisoners must realize that it is we who must do the changing." Exhibit 1, which was considerably longer, focused on the evils of the "capitalist system" and called for unity among prisoners to accomplish the goal of "destroying this whole rotten system." It continues, "This unity will be built only through struggle, primarily by fighting against the oppressive conditions we deal with every day," and concludes, "[I]f we all unite to fight the common enemy, no oppressive system, no matter how strong, will be able to resist the will of the people in their revolutionary struggle."

The documents were taken to the office of Alexander Cybulski, the assistant warden in charge of operations at Somers. In that capacity Cybulski was responsible for the control and custody of the

entire inmate population as well as for the overall security of that institution. His correctional experience totalled fifteen years cumulatively as a correctional counselor, correctional counselor supervisor, acting assistant warden of treatment and assistant warden, his present position. After Cybulski had read the copies of Exhibit A and Exhibit 1, the plaintiff was brought to Cybulski's office to explain what he intended to do with the documents. The plaintiff told Cybulski that he had typed the copies of Exhibit 1 and intended to distribute them to other inmates and that the copies of Exhibit A had been given to him by another inmate to read and distribute if he wished. He agreed that, if it were determined that Exhibit A was typed utilizing his work area typewriter, he alone was responsible for preparing the copies of that exhibit. A typing sample later taken from the typewriter used by the plaintiff in his work area matched the typing on Exhibit A.

On July 2, 1976, the plaintiff was given a disciplinary report[3] that was prepared by Cybulski. The report charged the plaintiff with having committed the prison offenses of "Attempt to Commit Riot" and "Giving False Information."[4] "Attempt to com-

---

[3] The disciplinary report contained a description of the July 1 incident.

[4] The prison rules and regulations define these offenses as follows:
"Section 10. ATTEMPT, CONSPIRACY, AND ACCESSORIES.
(a) Attempt. An inmate commits attempt when he does an act which constitutes a substantial step in a course of conduct planned to culminate in the commission of a prohibited act."
"Section 20. RIOT.
An inmate commits riot when he:
(a) With two or more other inmates intentionally or recklessly causes or creates a grave risk of alarm.
(b) Assembles with two or more other inmates for the purpose of engaging in conduct constituting the offense of riot.

mit riot" is a class A offense punishable by a loss of up to ninety days of "good time" credits[5] and/or twenty days in punitive segregation, and "giving false information" is a class B offense punishable by a loss of up to sixty days of good time and/or ten days of punitive segregation.

(c) Advocates, urges or organizes three or more inmates to engage in tumultuous and violent conduct of a kind likely to cause alarm.

(d) Incites, instigates, organizes, connives at, causes, aids, abets, assists or takes part in any disorder, disturbance, strike, riot or other organized disobedience to the rules and regulations of the institution."

"Section 26. GIVING FALSE INFORMATION.

An inmate commits giving false information when he:

(a) Makes false written or oral statement to a staff member which he does not believe to be true.

(b) Intentionally reports to a staff member an occurrence or incident which he knows did not in fact occur or gives intentionally false information relating to an occurrence or incident, or the alleged implication of some person."

[5] General Statutes § 18-7 provides in part: "The warden shall manage the Connecticut Correctional Institution, Somers, subject to the direction of the commissioner of correction, and he shall keep all the prisoners employed in such labor as the commissioner orders, during the term of their imprisonment. He shall also keep a record of any punishment inflicted upon a prisoner, showing its cause, mode and degree, and a like record of the conduct of each prisoner. Any prisoner sentenced to a term of imprisonment prior to October 1, 1976, may, by good conduct and obedience to the rules of said institution, earn a commutation or diminution of his sentence, as follows: Sixty days for each year, and pro rata for a part of a year, of a sentence which is not for more than five years; and ninety days for the sixth and each subsequent year, and pro rata for a part of a year, and, in addition thereto, five days for each month as a meritorious time service award which may be granted in the discretion of the warden and the commissioner for exemplary conduct and meritorious achievement; provided any serious act of misconduct or insubordination or persistent refusal to conform to institution regulations occurring at any time during his confinement in said prison shall subject the prisoner, at the discretion of the warden and the commissioner, to the loss of all or any portion of the time earned. Said commutation of sentence shall apply to any prisoner transferred from the Connecticut Correctional Institution, Somers, to the Connecticut Correctional Institution, Cheshire. . . ."

On July 6, 1976, a hearing was conducted by the Somers disciplinary board on these charges, at which time the plaintiff pleaded not guilty to both charges. Captain John Plonski, who had twenty-three years of experience as a correctional officer, was the chairman of the board which heard the charges. Prior to the hearing, Captain Plonski had been approached by inmates who had informed him that they were being coerced not to participate in the July 4 activities. At the hearing the plaintiff was informed of the offenses charged, to which he pleaded not guilty, and was presented with the evidence before the board. The plaintiff was not informed of the reports from other inmates,[6] and the committee did not consider these reports in its deliberations. The only evidence before the board consisted of the two documents taken from the plaintiff on July 1, 1976, and the disciplinary report given to the plaintiff by Cybulski on July 2, 1976. Each member of the committee asked the plaintiff if he had any explanation for his possession of the documents taken from him on July 1, 1976, but he offered none. Although each member of the committee gave the plaintiff ample opportunity to make a statement, he chose not to.[7] The board found the

---

[6] This fact, which appeared in one of the paragraphs of the plaintiff's draft finding, is added to the finding as admitted and undisputed. The plaintiff's claim that it is undisputed that Captain Plonski considered the complaints from other prisoners in his deliberations is without merit. The evidence supports the court's conclusion that this evidence was not considered by Plonski or the board.

[7] Although the plaintiff knew that at this hearing he could have had the assistance of a staff advocate, who is not an attorney, he declined this assistance. He knew that an advocate could have helped him in preparing a defense, talked with witnesses suggested by him, and presented witnesses and any information which he wished before

plaintiff guilty of both charges and, pursuant to prison disciplinary procedure, recommended to John Manson,[8] the Connecticut commissioner of correction, that the plaintiff spend ten days in punitive segregation[9] and that he be deprived of ninety days good time. At the direction of the board, a summary of its fact findings and the recommendation of disciplinary action was prepared by the "reporter" and a copy was given to the plaintiff. Commissioner Manson reviewed and approved the board's findings of guilt on both charges. This petition followed.

The plaintiff claims that the disciplinary board proceedings violated his due process rights under the federal constitution because of the board's failure to provide him with a written statement adequately setting out (1) the evidence relied on at the hearing and (2) the criteria applied and reasons for the disciplinary action taken. He also claims that he has a right to possess and distribute the documents in question that is protected by the first

the board. The plaintiff did not request the presence of any witnesses at the hearing. He also could have requested a postponement of the hearing so that an advocate, had he asked for one, would have had an opportunity to familiarize himself with the charges.

Unlike the fact finder in a criminal prosecution, a prison disciplinary board may consider a prisoner's silence in the face of alleged wrongdoing as evidence of guilt. *Baxter* v. *Palmigiano*, 425 U.S. 308, 316–17, 96 S. Ct. 1551, 47 L. Ed. 2d 810 (1976); cf. *Griffin* v. *California*, 380 U.S. 609, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965).

[8] John Manson, who has been commissioner since 1971, has been in the corrections field since 1956 and has served as a parole officer, probation officer (in both state and federal systems) and as deputy commissioner of the Connecticut department of correction with responsibility for all parole services and institutional services.

[9] The record discloses that the plaintiff actually spent only four days in punitive segregation.

amendment to the federal constitution and that the board's action violated that right.[10] The trial court found no such violations and dismissed the petition.

# I

As the United States Supreme Court pointed out in *Wolff* v. *McDonnell,* 418 U.S. 539, 555, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974), "a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime," although "his rights may be diminished by the needs and exigencies of the institutional environment." Prisoners retain rights under the due process clause; see *Bounds* v. *Smith,* 430 U.S. 817, 97 S. Ct. 1491, 52 L. Ed. 2d 72 (1977); *Johnson* v. *Avery,* 393 U.S. 483, 89 S. Ct. 747, 21 L. Ed. 2d 718 (1969); but these rights are subject to reasonable restrictions imposed by the nature of the institution to which they have been lawfully committed. *Wolff* v. *McDonnell,* supra, 556. "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price* v. *Johnston,* 334 U.S. 266, 285, 68 S. Ct. 1049, 92 L. Ed. 1356 (1948). The requirements of due process in prison disciplinary proceedings must be ascertained in light of the need for a "mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application." *Wolff* v. *McDonnell,* supra, 556.

---

[10] In his amended application, the plaintiff specifically deleted his claims that the disciplinary board did not "provide him with adequate advance written notice of the grounds upon which the charges of 'Giving False Information' and 'Attempt to Incite Riot' were based" or "provide him with an opportunity to call witnesses and present favorable evidence."

In *Wolff*, the Supreme Court held that a prisoner's interest in statutorily created good time credits, which he can be deprived of only for serious misconduct, "has real substance and is sufficiently embraced within Fourteenth Amendment 'liberty' to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated." Id., 557. The court held in *Wolff* that disciplinary actions that result in the loss of good time credits must be accompanied by a written statement of the evidence relied upon by the decisionmaker and the reasons for the disciplinary action taken. Id., 564–65.

The plaintiff's claim that the disciplinary board failed to inform him of the evidence upon which it relied is without merit. The board's statement in its "Disciplinary Board Summary," which was given to the plaintiff, contained a summary of the evidence upon which it relied in making its determination.[11] The factual basis of the board's action is adequately set forth in that summary.

The plaintiff is correct, however, in his claim that the disciplinary board summary did not adequately set forth a statement of the reasons for the action taken, although it did refer to the "seriousness" of

[11] The statement recited the following: "Roque was returning to his housing unit from the Industries area. Officer at the Industries' gate confiscated a number of copies of both Exhibit A and Exhibit B. Roque admitted that Exhibit A copies were for distribution. He indicated that Exhibit B copies were to be read by him and distributed by him if he so desired. He was told that he would be held responsible if Exhibit B copies were typed from his work area typewriter. It was found through sample typing that Exhibit B copies were typed on his work area typewriter. Roque made no attempt to defend himself on these charges. He indicated that he had nothing to say on his behalf. He did admit reading Exhibits A and B." The board's Exhibit B is referred to in this opinion as Exhibit 1.

the class A violation. Instead, the reasons justifying the punitive action of the board became apparent in testimony before the trial court on the habeas corpus application. The court made certain findings based on that testimony, which the plaintiff claims cannot satisfy the constitutional mandate of due process. We do not agree.

The trial court found from the testimony presented that the exhibits, with their call for a united boycott of all activities on July 4, 1976, threatened a polarization among the inmate population between those who wished to participate in the special activities of the day,[12] and those who chose to participate in the boycott; that the documents and the action instigated therein threatened organized disobedience to certain rules and security measures of the institution; and that the documents posed a threat of confrontations among the prisoners and between the staff and the prisoners. These reasons amply support the board's determination that the plaintiff had engaged in serious misconduct that warranted the penalty imposed for the offense of attempt to commit riot. The question presented is whether the requirements of due process were satisfied when the board failed to state its reasons for so deciding in its disciplinary summary but did so, through its chairman Captain Plonski, at the hearing on the application for a writ of habeas corpus. Although it would have been preferable for the board to indicate at the time it prepared the disciplinary summary the reasons for the disciplinary action it took, we cannot say that the procedural irregularity deprived the

[12] The fourth of July was celebrated at Somers by the giving of additional recreation time to the inmates, track and field events, prizes and movies, together with an unlimited supply of picnic foods. Extra recreation time for the inmate population is given only two times in the course of a year at the prison.

plaintiff of "reasoned and fair decisionmaking." See *Lee* v. *Board of Education*, 181 Conn. 69, 80, 434 A.2d 333 (1980). While there is no statutory right to judicial review of prison disciplinary proceedings; cf. *Lee* v. *Board of Education*, supra, 78–79; there are other circumstances in which the action taken by a disciplinary board may be reviewed by other bodies.[13] Therefore, we conclude that, as a matter of constitutional law, the statement of reasons for the action taken with respect to the attempt to commit riot offense, as testified to below and found by the trial court, should be included in the disciplinary summary in the plaintiff's records. *Wolff* v. *McDonnell*, 418 U.S. 539, 564–65, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974).

The same can be said for the board's failure adequately to state the reasons for the disciplinary action taken with respect to the charge of giving false information. The trial court found from the testimony presented that the offense of giving false information fosters conflict and causes a waste of staff time because of the need to obtain verification of the information given. These reasons, which adequately justify the action taken here, should also appear in the disciplinary report filed by the board in this case.

## II

The plaintiff claims that his possession and distribution of the materials in question was activity protected by the first amendment to the United States constitution, which may be abridged by the

[13] The Supreme Court in *Wolff* v. *McDonnell*, 418 U.S. 539, 564–65, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974), pointed out that a prison disciplinary record may be reviewed in the process of making decisions concerning prisoner transfers and parole. Moreover, the record of these proceedings may also affect future disciplinary proceedings.

state only where a compelling state interest exists for so doing. The plaintiff argues that because no such interest was shown to exist here, the actions of the board violated his constitutional rights. It is true that, in general, where state action impinges upon a fundamental right, that action will be sustained only upon the showing of a compelling state interest that can only thus be protected. See Tribe, American Constitutional Law § 12-8 (1978). Such analysis is not appropriate, however, in weighing the constitutionality of the conduct of state prison officials. See *Blue* v. *Hogan,* 553 F.2d 960, 963 (5th Cir. 1977). Restrictions on personal liberties that would be considered unacceptable where the general public is concerned are often essential within the strictures of the prison community. See *Pell* v. *Procunier,* 417 U.S. 817, 825–26, 94 S. Ct. 2800, 41 L. Ed. 2d 495 (1974). The Supreme Court has indicated that in the prison environment a less demanding balancing test, instead, is to be applied. In *Pell* v. *Procunier,* supra, 822, it stated: "[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." See also *Jones* v. *North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 129, 97 S. Ct. 2532, 53 L. Ed. 2d 629 (1977); *Procunier* v. *Martinez,* 416 U.S. 396, 412, 94 S. Ct. 1800, 40 L. Ed. 2d 224 (1974). Thus, challenges to prison restrictions that have an impact upon first amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system. *Pell* v. *Procunier,* supra, 823. Although deterrence of crime and rehabilitation are legitimate penal objectives, "central to all other corrections goals is the institutional consideration of internal

security within the corrections facilities themselves." Ibid. First amendment rights do not evaporate upon the claim of internal security, however, and the restrictions imposed must be no greater than necessary or essential to the protection of the particular governmental interest involved. *Procunier* v. *Martinez, supra,* 414.

In *Jones* v. *North Carolina Prisoners' Labor Union, Inc., supra,* the Supreme Court sanctioned the curtailment of prisoners' first amendment associational rights by applying the following test: "[Associational rights] may be curtailed whenever the institution's officials, in the exercise of their informed discretion, reasonably conclude that such associations, whether through group meetings or otherwise, possess the likelihood of disruption to prison order or stability, or otherwise interfere with the legitimate penological objectives of the prison environment." Id., 132. We believe that the same test is appropriate where the prisoner's freedom of speech is concerned. See *Wolff* v. *McDonnell,* 418 U.S. 539, 566–67, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974); *Procunier* v. *Martinez, supra,* 405; *Courtney* v. *Bishop,* 409 F.2d 1185, 1187 (8th Cir.), cert. denied, 396 U.S. 915, 90 S. Ct. 235, 24 L. Ed. 2d 192 (1969).

We must determine, then, whether the board abused its discretion in concluding that the order and stability of the institution would be threatened by the distribution of the materials in question. In this regard, we note that the prison officials primarily involved in this case had substantial experience in the area of penology. Moreover, trained officials, rather than a reviewing court far removed from the prison environment, are particularly aware of the

prevailing attitudes and propensities of the prison population. See *Procunier* v. *Martinez,* 416 U.S. 396, 405, 94 S. Ct. 1800, 40 L. Ed. 2d 224 (1974). That prisoner dissatisfaction and unrest can easily foment wide scale violence has been too often demonstrated to be considered unlikely.[14]

An examination of the language involved here and the activity that it advocated leads us to the conclusion that the prison officials did not abuse their informed discretion in preventing the possession and distribution of the documents they seized. As the excerpts we referred to above demonstrate, these writings were not simply conveying philosophic thought. See *Cofone* v. *Manson,* 409 F. Sup. 1033, 1042 (D. Conn. 1976). The writings involved here were fraught with instigation to concerted activity in opposition to the system of government and authority under which the inmates were living. The plaintiff was in the process of distributing these writings. Like the concerted activity (prisoner union) found to be constitutionally unprotected in *Jones* v. *North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 132–33, 97 S. Ct. 2532, 53 L. Ed. 2d 629 (1977), the plaintiff's activity here, if unrestrained, could have resulted in the eventual confrontation of prisoners and prison staff. Activity and literature which are likely to have that effect cannot be countenanced in the prison setting. *Sostre* v. *McGinnis,* 442 F.2d 178, 202 (2d Cir. 1971) ; *Williams* v. *Stacy,* 468 F. Sup. 1206, 1209 (E. D. Va. 1979).

---

[14] See American Prisons in Turmoil: Hearings Before the Select Committee on Crime, House of Representatives, 92nd Cong., 1st Sess., 136, 227 (1971); Proceedings of the One Hundred and Seventh Annual Congress of Correction of the American Correctional Association, 209 (1977).

Nor must prison officials wait and see if such literature does in fact have that effect. It is essential that administrators be given some latitude in anticipating the probable consequences of allowing certain speech or the dissemination of particular written matter in the prison environment. *Procunier* v. *Martinez,* supra, 414; see *Jones* v. *North Carolina Prisoners' Labor Union, Inc.,* supra, 132–33; *Blue* v. *Hogan,* 553 F.2d 960, 963 (5th Cir. 1977); *Pittman* v. *Hutto,* 448 F. Sup. 61, 64 (E. D. Va. 1978).

The plaintiff claims, however, that even if it was within the board's power to prohibit distribution of the writings here and to confiscate them, the additional imposition of penalties was unnecessary to protect prison security or order. See *Procunier* v. *Martinez,* supra, 414; *Sostre* v. *McGinnis,* supra, 202–203. While it is true that confiscation of the documents involved here would have removed the particular threat posed by their dissemination, we are not prepared to say that prison authorities cannot impose penalties to deter such activity in the future. Where the violation of prison rules and regulations is clear and the threat to security is serious, as it was here, prison authorities need not only act to remove the threat of the existing violation but may, by the imposition of penalties, deter future violations. By imposing punishment in addition to confiscation, prison authorities can help to ensure that the individual, as well as the entire inmate population, will be less likely to engage in such prohibited conduct in the future.[15] The board's imposi-

---

[15] We would be faced with a different question were it not reasonably foreseeable that the material involved would be prohibited in the prison setting.

tion of penalties did not amount to an abuse of discretion under the circumstances.

There is error only in the trial court's conclusion that the disciplinary board adequately set forth the reasons for the action taken; the judgment is set aside and the case is remanded with direction to render judgment ordering the disciplinary board to include in its disciplinary summary a statement of the reasons for the action taken by it; the disciplinary action taken otherwise complies with the United States constitution.

In this opinion the other judges concurred.