[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
These are two habeas petitions filed by inmates incarcerated at Northern Correctional Institution. While each petition was filed separately, and there is one difference between the, petitioners relating to their respective dates of transfer into Administrative Segregation, in all other respects the petitions raise identical legal issues. Accordingly, the court appointed the Legal Clinic of the University of Connecticut Law School to represent both petitioners, and the court heard both petitions at a consolidated hearing.
Prior to the commencement of the hearing, each petitioner filed a document captioned "Final Amended Application for Writ of Habeas Corpus" dated November 21, 1996, containing six counts. The petitions contain parallel legal claims. In sum, Count One contains an allegation that the respondent has reduced statutory good time earned by the petitioners without giving the petitioners a hearing. Count Two asserts that Administrative Directive 9.4, effective July 6, 1994, can not be applied to the petitioners to deny them monthly good time credit earned or the right to earn statutory good time on the basis that the Administrative Directive is an ultra vires exercise of power by the respondent. In Count Three, the petitioners allege that Administrative Directive 9.4, paragraph 5, effective July 6, 1994, violates the petitioners' constitutionally protected rights to equal protection under the law as it uses the status of one's administrative classification to deprive him of the right to have the duration of his confinement be calculated by statutory formula otherwise applied to all inmates sentenced for offenses committed on or after July 1, 1983. In Count Four, the petitioners allege that the respondent's refusal to credit them CT Page 5860 with earned statutory good time from July 6, 1994 until August 1, 1996 violates due process of law because the petitioners were not accorded a hearing after due notice to determine whether and for what specific period of time they would be deprived of monthly statutory good time. Count Five consists of an allegation that Administrative Directive 9.4, paragraph 5, effective July 6, 1994 and later amended, cannot be legally applied to them to deny them monthly statutory good time credit because the Administrative directive was not promulgated in accord with applicable provisions of the Uniform Administrative Procedures Act. Finally, Count Six contains an allegation that the respondent's policy to deny the petitioners monthly sentence reductions for good conduct and obedience to the rules violates the ex post facto
prohibition of the State and Federal constitutions.
In response to the petitions, the respondent filed returns as well as affirmative defenses. With respect to the latter, the respondent claims that the habeas court lacks subject matter jurisdiction over the petitioners' security classification, location of confinement, and contingent interest in earning statutory good time in the future on the basis that none of these issues implicates a liberty interest cognizable in habeas jurisdiction. The respondent also claims that even if the habeas court has subject matter jurisdiction, none of the claims asserted by the petitioners implicates a cognizable liberty interest sufficient to state a claim for habeas corpus relief Alternatively, the respondent avers that even if the petitioners have raised a cognizable claim, they were afforded hearings which fully comport to any procedural due process requirements applicable to them. The respondent further claims that even if there is a liberty interest implicated in the ability to earn statutory good time, the Departmental procedures outlined in Administrative Directives 9.4 and 9.5, provide for appropriate due process procedures, and that any deviation from them found to have taken place with respect to either or both petitioners was harmless. The respondent also claims that even if the petitioners' security classifications are defective in a manner which invokes habeas jurisdiction, the court would have no authority to order the respondent to award statutory good time to the petitioners or to order them released from administrative segregation. In this claim, the respondent argues that this court's authority would not extend beyond an order that the petitioners be given additional administrative segregation hearings. Finally, the respondent claims that the petitioner's conduct in connection with their A.S. hearings as well as during CT Page 5861 confinement in Administrative Segregation constitute a waiver of claims made in their petitions.
Based on the evidence adduced at the habeas hearing, the court makes the following findings and orders.
The petitioner John Narducci is an inmate confined to the custody of the Commissioner of Corrections pursuant to eleven mittimuses issued by the Superior Court on sentencing dates from 1989 through 1993. While Narducci was originally sentenced in 1989 to a total effective sentence of five years incarceration, subsequent convictions for offenses committed while in custody, including Assault on a Peace Officer in violation of Connecticut General Statutes § 53a-167c (two convictions), Possession of a weapon in a Correctional Institution in violation of C.G.S. § 53a-174 (two convictions), and Assault in the Second Degree in violation of C.G.S. § 53a-60 (a)(5) resulted in sentences consecutive to his original five year sentence. As a result of these several convictions, Narducci is serving a total effective sentence of ten years.
During Narducci's incarceration, he was transferred to a correctional facility in Oklahoma. On March 30, 1994, he was returned from Oklahoma and placed at the Walker Reception Facility. On April 8, 1994, Narducci was given notice that he would be the subject of an Administrative Segregation classification hearing for reason that he had been an assaultive inmate while in Connecticut corrections, and had been classified Administrative Segregation prior to his transfer to Oklahoma. On April 12, 1994, Narducci was classified in Administrative Segregation following an Administrative Segregation hearing at which he was assisted by a staff advocate. Narducci stated at the hearing that he understood the reasons he was being recommended for Administrative Segregation; While he has not been given any subsequent Administrative Segregation hearings, his status as an inmate in Administrative Segregation has been the subject of periodic review.
The petitioner Marvin Beasley is an inmate confined to the Commissioner of Corrections pursuant to two mittimuses issued by the Superior Court. On December 12, 1990, he received a sentence of twenty years incarceration for the offense of Manslaughter in the First Degree in violation of C.G.S. § 53a-55 (a)(3). Thereafter, on July 13, 1995, he was sentenced to a total effective sentence of two years, consecutive to the Manslaughter CT Page 5862 sentence, for the offenses of Assault in the Second Degree in violation of C.G.S. § 53a-60, and Possession of a Weapon in a Correctional institution in violation of C.G.S. § 53a-174a. The 1995 sentences related to an incident while Beasley was an inmate in which he stabbed and seriously wounded another inmate. On March 16, 1995, Beasley was given notice that he would be the subject of an Administrative Segregation classification hearing based on this violent and near fatal assault on another inmate. At the hearing, which took place on March 21, 1995, Beasley stated that he understood the purpose of the hearing, and he gave a statement to the hearing officer. Following the hearing, on March 23, 1995, Beasley was classified in Administrative Segregation. While Beasley was in Administrative Segregation his classification status was made the subject of periodic review.
The Administrative Segregation hearings provided both inmates comported with due process requirements. cf. Wolti v,McDonnell, 418 U.S. 539 (1974).
During the habeas hearing, the court heard testimony from John J. Armstrong, the Commissioner of Corrections. Commissioner Armstrong, who was appointed to his position in March, 1995, is an experienced correctional administrator. Now in his twenty-first year in corrections, Commissioner Armstrong has a Bachelors Degree in Law Enforcement and a Masters Degree in Criminal Justice. He started with the Department of Corrections as a correctional officer, and rose through the ranks, serving as a correctional treatment officer, correctional counselor, facilities warden, regional director, and then Deputy Commissioner for Programs prior to his appointment.
Commissioner Armstrong stated that the Department's mission includes a mandate for the protection of the public and the staff, and that he is responsible to maintain secure, safe and humane correctional facilities in an environment that promotes professionalism, respect, integrity, dignity and excellence. The Commissioner's authority is established by statute. In pertinent part, C.G.S. § 18-81 provides that the Commissioner ". . . shall administer, coordinate and control the operations of the department and shall be responsible for the overall supervision and direction of all institutions, facilities and activities of the department. He shall establish rules for the administrative practices and custodial and rehabilitative methods of said institutions and facilities in accordance with recognized correctional standards. He shall establish, develop and maintain CT Page 5863 noninstitutional, community-based service programs. He shall be responsible for establishing disciplinary, diagnostic, classification, treatment, vocational and academic education, research and statistics, training and development services and programs through the department . . ."
At present there are approximately sixteen thousand (16,000) inmates distributed among the nineteen correctional institutions and four correctional centers controlled by the Department of Corrections. These inmates are all classified under a classification system which contains five levels of risk to public safety, with level one assigned to inmates who pose the least risk and level five assigned to those who pose the greatest risk. The Department's separate facilities also bear classification risk levels. Thus, for example, a facility may be designated as a level two facility with the import that only inmates who are classified either level one or two could be assigned to that facility. The classification of inmates and facilities, and the corresponding assignment of inmates to particular facilities is done by the Department for purposes of security, safety, and the provision of programs appropriate to each facility's inmate population.
In terms of procedure, an inmate who has received a sentence of two or more years is initially assigned to the Walker Reception Facility where the inmate is assessed for violence and then given a classification designation. This assessment consists of an evaluation of information about an offender including the inmate's background and nature of the crime resulting in incarceration, the person's propensity for violence, sex offender history, behavioral history in terms of patterns of intensity of behavior, as well as mental health testing. Inmates have the opportunity to participate in this initial classification process, to understand the range of classification levels, to learn the basis for determining the level of risk ascribed to the inmate, as well as the process by which an inmate's classification may be reviewed and changed. While this initial classification designation is made at Walker, the classification process is continuous. An inmate may be moved from one classification to another, and also from one facility to another, depending on the inmate's comportment and needs, and risks presented by the inmate to the staff and inmate population.
At present, the facility known as Northern Correctional Institution (Northern) is a level five facility, housing CT Page 5864 approximately one hundred eighty (180) offenders. With the exception of death-sentence inmates who are incarcerated at Northern, the population at Northern consists of inmates whose assaultive or violent behavior as inmates has been determined to present an immediate threat to other inmates, the general inmate population, and/or the corrections staff. These inmates are maintained in Administrative Segregation, a level five confinement.
Pursuant to the authority set forth in C.G.S. § 18-81 to, ". . . establish rules for the administrative practices and custodial and rehabilitative methods of said institutions and facilities in accordance with recognized correctional standards . . .", the Commissioner has promulgated a set of Administrative Directives, which are written guidelines pertaining to the Department's several correctional facilities. These Directives, which are not promulgated in accordance with the procedural dictates of the Uniform Administrative Procedures Act, are utilized by the Commissioner to establish parameters for the operation of the several facilities and also to delegate authority for their day to day maintenance to the facility administrators. During the habeas hearing, Commissioner Armstrong testified that the Department has always operated under Administrative Directives, and that virtually all internal procedures of the Department are governed by Administrative Directives. These Directives are used as guidelines to staff to adhere to the department's mission, to set forth procedures for dealing with specific issues, to define classification and its workings.
Administrative Directive 9.4 defines Administrative Segregation as "Placement of an inmate on a Restrictive Housing Status that results in segregation of the inmate who's [sic] behavior, while incarcerated, poses a threat to the security of the facility or a risk to the safety of staff or other inmates, and that the inmate can no longer be safely managed in general population." The purpose of Administrative Segregation is not to punish incorrigible inmates but to manage and control violent offenders and to reduce the risk of harm to staff and other inmates. Inmates who are assigned to Administrative Segregation at Northern are given a facilities handbook upon admission to Northern. This handbook provides information to the inmates concerning the rules and practices pertaining to confinement at Northern. CT Page 5865
The Administrative Directives provide that an inmate who is being considered for placement in a higher risk classification is entitled to a classification hearing. The inmate is entitled to be informed of the reasons he is being considered for classification change. He is entitled to be assisted by an advocate, and to be heard by the classification hearing officer. This process took place with respect to both inmates.
Once an inmate is placed in Administrative Segregation, his classification status is subject to periodic review. For the first eight weeks, the inmates status is reviewed once a week. Thereafter it is reviewed once every thirty days. At the monthly classification review the inmate is generally present and is given an opportunity to discuss the factors related to his status. Both petitioners have been afforded the opportunity to participate in this classification-review process while confined in Administrative Segregation.
Within Administrative Segregation at Northern, there is a phase program consisting of three phases. Phase one, which is usually for a period of no less than six months, is the most restrictive. Inmates in phase one are confined to their cells except for limited periods and are closely monitored by staff. When the inmates are taken from their cells they are maintained in hand cuffs and leg irons. Inmates in phase one periodically meet with Corrections personnel to be apprised of their progress and to have the opportunity to discuss issues relating to whether they are moving toward phase two. In phase two, which normally lasts for three months, inmates are allowed more time outside of their cells for purposes of supervised discussions, and also for the staff to observe the inmates' ability to interact in a controlled environment with other inmates. Inmates who successfully move to phase three are able to be in a less restrictive environment as a continuation of their progress back into the general inmate population. Those who successfully complete the phase program are then reclassified, and moved to a lower classification facility. While inmates are not guaranteed movement from one phase to another in any specific time period, they are made aware of the general requirements for movement from one phase to another, and they are given an opportunity, while in the phase program, to discuss issues relevant to their movement through the program. Over the past several months Beasley has successfully completed the phase program. On August 6, 1996 he was removed from Administrative Segregation and placed in a lower classification facility. Since being placed in Administrative CT Page 5866 Segregation, Narducci has received disciplinary hearings for assault on a Corrections Officer, Possession of Contraband, and for Interfering with Safety and Security and Fighting. He continues to be classified in Administrative Segregation, and has recently been moved from Phase Two to Phase One because of his misconduct while in Phase Two. In both cases, both petitioners were informed of their progress while in the phase program. Each knew what he had to do to move from the most to the least restrictive environment in Administrative Segregation as well as the requirements for reclassification to a lower risk level.
The Commissioner values Administrative Directives as flexible, easily promulgated guidelines for the administration of the Department, for control of the inmate population, and for the protection of the safety and security of staff and inmates.
Administrative Directive 9.4 was changed by (then) Commissioner Meachem to state that effective July 6, 1994, inmates classified in Administrative Segregation would not be eligible to earn statutory good time while in Administrative Segregation. Notice of this change was provided to the inmate population through postings. Additionally, copies of the Administrative Directives are kept in each facility and are available to the inmate population. The court notes, however, that this change was not immediately noted in the Northern inmate handbook.
The Administrative Directive that inmates classified Administrative Segregation may not earn statutory good time is in accord with sound correctional policy. Commissioner Armstrong testified that he conducted a survey of approximately nineteen states to see what other states do with regard to the administrative segregation population. He learned that more than half the states contacted make high security inmates ineligible to earn good time. Additionally, the Commissioner requested that the Administrative Segregation program at Northern be audited by the National Institute of Corrections. Such an audit was conducted by an experienced correctional administrator who determined that the Northern program was in compliance with standards set forth by the American Corrections Association.
The purpose of the rule which makes an inmate in Administrative Segregation ineligible to earn statutory good time is not punitive. Rather the rule is viewed by the Commissioner as an aid to control the inmate population, and to affect compliance CT Page 5867 with correctional rules. The Commissioner testified that inmates who are classified in Administrative Segregation are typically the most violent. They have been guilty of assaults on other inmates or staff; there behavior has been threatening. They can not be controlled in general population. And because of their history and propensity for violence, inmates who are placed in Administrative Segregation are strictly controlled. They are not available for work. They must be held in close confinement, and continuously monitored. As a consequence, they are not in a position to earn statutory good time. At best, they can earn their way back into the general inmate population.
Since Northern was opened for operation incident levels among the prison population have decreased markedly. The Commissioner testified that assaults on staff, inmate assaults on other inmates, disturbances, work stoppages, and gang-related activity have all been reduced. In 1994, inmate assaults on staff totaled 625. That figure was reduced to 425 in 1995. The number of assaults committed by inmates on inmates was reduced from 1285 in 1994 to 882 in 1996. The Commissioner testified that the change in Administrative Directive 9.4 was a powerful factor in this overall reduction in assaults of approximately 30% from one year to the next.
For each inmate within it's custody, the Department maintains a document commonly referred to as a "time sheet" which purports to show the inmate's total sentence, the various credits earned by the inmate toward commutation of his sentence, and an anticipated release date. This document is periodically updated and provided to inmates. Until quite recently, this computer-generated document reflected a credit of statutory good time on a monthly basis to each inmate in Administrative Segregation coupled with a forfeiture of the same number of days for each month.
Mary Jane Steele, a Department of Corrections records specialist, testified that the time sheet was not changed to show that no statutory good time has been earned by Administrative Segregation inmates since July 6, 1994 because of difficulties in adjusting the computer program that generates the document. She testified that even though the form shows the grant and forfeiture of good time for each month, she is aware that inmates in Administrative Segregation have not, in fact, earned statutory good time since July 6, 1994. While the court agrees with the petitioners that this form, if read in isolation, purports to CT Page 5868 show that inmates are receiving, and then forfeiting, good time during each month of confinement in Administrative Segregation, this form has to be viewed in the larger context of information provided to the inmate population. The court is satisfied that once Administrative Directive 9.4 was amended effective July 6, 1994 to make inmates in Administrative Segregation ineligible to earn statutory good time, ample notice of this change was provided to the petitioners herein as well as to the general inmate population. The court views the Administrative Directive itself as the operative rule. The maintenance and dissemination to inmates of flawed time sheets purporting to show a grant coupled with a forfeiture was an unartful and inaccurate attempt to accommodate the new directive to an unnecessarily rigid computer program.
During the period of time that Beasley was classified in Administrative Segregation he was not eligible to earn, and he did not earn, any statutory good time. During the period of time that Narducci has been classified in Administrative Segregation, he was credited with and earned statutory good time until July 6, 1994, the effective date of Administrative Directive 9.4. Thereafter, Narducci, still in Administrative Segregation, has not been eligible for and has not earned any statutory good time.
There are certain precepts germane to the court's consideration of the petitioners' claims.
The court is not a shadow prison administrator. As noted by the respondent in his brief, our Supreme Court, in Washington v.Meachum, 238 Conn. 692, 734, subscribed to a governing principle enunciated by the United States Supreme Court in Procunier v.Martinez, 316 U.S. 396 (1974), that courts should be cautious in intervening in correctional administration. In Procunier, the court stated:
 "Traditionally, federal courts have adopted a broad hands-off attitude toward problems of prison administration. In part this policy is the product of various limitations on the scope of federal review of conditions in state penal institutions. More fundamentally, this attitude springs from complementary perceptions about the nature of the problems and the efficacy of judicial intervention. Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, CT Page 5869 to the extent that human nature and inadequate resources allow, the inmates placed in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism." Procunier v. Martinez, supra, 416 U.S. 404-405.
While the court in Procunier was dealing with the specific issue of Federal court intervention in the administration of state prisons, the court's reasoning is applicable to the more general consideration of judicial intervention in penal administration.
As a second construct, habeas jurisdiction, while open to inmates who seek petitions that implicate liberty interests, is not available to respond to every conceivable correctional wrong alleged by an inmate. Claims that do not involve issues of fundamental fairness implicating an inmate's liberty interest are not the proper subjects of habeas jurisdiction. To permit such claims would only serve to trivialize the "Great Writ". cf.Lozada v. Warden, 223 Conn. 834 (1992); Vincenzo v. Warden,26 Conn. App. 132 (1991).
Additionally, prisons are places of great potential for danger. Inmates who are confined to prison are there because they have been found guilty of crimes sufficiently serious to warrant their present removal from the community. The Commissioner's mandate to maintain inmates in safe and secure facilities, by necessity involves some limitation of prisoners rights. The Commissioner must have a free hand to implement and enforce rules for the safety and security of the staff and inmates so long as they do not interfere with prisoners' fundamental rights. Our Supreme Court in Roque v. Warden, 181 Conn. 85 (1980), noted that imprisonment, by its nature, brings some diminution in rights to prisoners. The court stated:
As the United States Supreme Court pointed out CT Page 5870 in Wolff v. McDonnell, 418 U.S. 539, 555, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), `a prisoner is not wholly stripped of constitutional predictions when he is imprisoned for crime,' although `his rights may be diminished by the needs and exigencies of the institutional environment.' Prisoners retain rights under the due process clause; but these rights are subject to reasonable restrictions imposed by the nature of the institution to which they have been lawfully committed. (citations omitted) `Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system' (citations omitted) The requirements of due process in prison disciplinary proceedings must be ascertained in light of the need for a `mutual accommodation between the institutional needs and objectives and the provisions of the Constitution that are of general application.' Wolff v. McDonnell, supra, 556."
The petitioners claim that they have a statutory right to earn statutory good time and that by denying them the opportunity to earn good time the Commissioner is acting outside his statutory authority. C.G.S. § 18-7a(c) provides, in pertinent part:
 "Any person sentenced to a term of imprisonment for an offense committed on or after July 1, 1983, may, while held in default of bond or while serving such sentence, by good conduct and obedience to the rules which have been established for the service of his sentence, earn a reduction of his sentence as such sentence is served in the amount of ten days for each month served and pro rata for a part of the month served of a sentence up to five years, and twelve days for each month served and pro rata for a part of a month served for the sixth and each subsequent year of a sentence which is more than five years. Misconduct or refusal to obey the rules which have been established for the service of his sentence shall subject the prisoner to the loss of all or any portion or such reduction by the commissioner or his designee." (underlining added.)
The petitioners argue that this statute entitles them to earn statutory good time. They would have the court read the word "may" as "shall" in the first sentence of the statute. Such a reading is inconsistent with the statute's history. In Seno v.Commissioner, 219 Conn. 269 (1991), the court discussed a 1982 CT Page 5871 amendment to C.G.S. § 18-7a which added the phrase "as such sentence is served" to the language relating to the grant of good time. Prior to this amendment, it was the practice of the Department of Corrections to calculate and credit all of an inmate's good time at the statutory rate at the beginning of his sentence, instead of posting it as earned. Speaking for the court, Justice Borden stated:
 "The legislative history of Public Acts 1982, No. 82-379 demonstrates that the act was designed to attain two related objectives. First, the legislature sought to return to the original concept behind good time, that is, the concept of reward for good behavior. Senator Nancy L. Johnson defined this objective stating: `All this bill really does is to return the initial concept of good time which was a concept of reward. A reward for good behavior. When you deduct the entire amount at the front end of the sentence, then what you revert to is the system of punishment for poor behavior. So that instead of granting good time you actually end up earning penalties for poor behavior. . . . All it means is that the reward will not be front-ended. The reward must be earned and, indeed, good time will reduce the sentence, essentially that sentence that is there now, the kind of sentence that is being given now. . . . The importance of this bill is that it returns to the original sound concept of good time which is a concept of reward for good behavior rather than a concept of punishment for failure to provide good behavior.' 25 S. Proc., Pt. 12, 1982 Sess., pp. 3826-27."
Justice Borden also noted these comments of Representative Wayne Fox:
 "Mr. Speaker, I think it's important before we vote on this issue that we understand completely what's involved and that the issue not be muddied by extraneous information. The issue I submit is a very simple one. It's an issue of public policy. We have a concept which we call good time. That is to provide an individual with credit for behaving himself or herself while serving an sentence imposed by our courts. The question is whether or not that individual should receive credit for that time before that individual ever steps into a jail. As the statute is presently interpreted one receives that credit at the time the sentence is imposed and prior to ever serving any time. This bill as amended would provide that one would receive the credit for good time as one earns it." 25 H.R. Proc., Pt. 11, 1982 Sess., CT Page 5872 pp. 3555-56."
While the discussion in Seno concerned the time at which an inmate is entitled to begin to receive good time at the enhanced rate of twelve days a month, both Justice Borden's comments and those of the cited legislators are instructive to the issue at hand. Neither legislator argued that the amendment was intended to provide for an automatic grant of good time for being an inmate alone. Both legislators noted the nexus between the grant of good time and the notion of good conduct and obedience. If good time were a statutory right regardless of one's behavior then the language in C.G.S. § 18-7a(c) regarding good conduct and obedience must be viewed as surplusage. This the court will not do. The statute is not itself a grant of good time. It establishes an entitlement to earn good time by good conduct and obedience to the rules established for the service of a sentence. As such, it establishes the parameters for the exercise of discretion by the Commissioner in making an award of good time; it does not mandate the grant.
The petitioners further argue that the last sentence of C.G.S. § 18-7a relating to the forfeiture of earned good time is a limitation on the Commissioner's ability to withhold good time. The argument is circular. If the good time is not earned in the first place, then it can not be forfeited. The last sentence constitutes a legislative authorization to the Commissioner to take earned good time from inmates who, after they have been credited with good time, are subsequently guilty of misconduct or a refusal to obey the rules. In the case of Beasley and Narducci they never earned the good time while in Administrative Segregation after July 5, 1994.
The petitioners further argue that by singling out prisoners who are confined to Administrative Segregation, the Commissioner has denied those inmates the equal protection of the law. The distinction between inmates in Administrative Segregation and those who are not is founded on an assessment that the former have behaved so poorly in general population that their continued presence in the less restrictive inmate population constitutes a threat to safety and security. The distinction is founded on a rational basis. Since the award of statutory good time does not implicate a fundamental right, a distinction founded on a rational basis is sufficient to with(c) stand attack on an equal protection basis. Frazier v. Manson, 176 Conn. 638 (1979) CT Page 5873
Having determined that the petitioners have not, in fact, earned statutory good time while in Administrative Segregation, the next question is whether the petitioners have a liberty interest, cognizable in habeas jurisdiction to earn statutory good time. They do not. This issue was decided by the Appellate Court in Abed v. Commissioner of Corrections, 43 Conn. App. 176
(1996), cert. den'd., 239 Conn. 937 (1996). In Abed, the court concluded that C.G.S. § 18-7a(c) "does not give the petitioner a liberty interest in good time credits he has not yet earned." Id. The court continued, "We conclude that the decision to deny inmates classified as safety threats the opportunity to earn the good time credits specified in C.G.S.18-7a(c) does not rise to the level of a constitutionally protected liberty interest." Id. In concluding that inmates classified as security risk group threat members do not have a liberty interest in being eligible to earn good time, the Abed court distinguished its petitioner's circumstances from those found inNichols v. Warden. 209 Conn. 191 (1988), where the court held that the Commissioner may not lawfully cause a prospective forfeiture of unearned statutory good time. The court stated, "Nichols does not conclude that C.G.S. 18-7a(c) compels the automatic award of good time credits, but rather concludes that once an inmate has become eligible to earn statutory credits, such credits cannot be surrendered before they are earned. Beasley and Narducci are akin to Abed and not to Nichols. They are simply not eligible to earn statutory good time.
The petitioners' claim that the Administrative Directives were not promulgated in accordance with provisions of the Uniform Administrative Procedures Act does not raise a justiciable habeas issue since adherence to the Uniform Administrative Procedures Act in determining procedures related to the award of statutory good time does not implicate a liberty interest. cf. Vincenzo v.Warden, 26 Conn. App. 132 (1991). The court finds that the Administrative Directives promulgated by the Commissioner are "rules" developed by the Commissioner pursuant to his statutory authority. cf. C.G.S. § 18-81.
The petitioners also claim that the Administrative Directive 9.4 must fail because it violates the constitutional prohibition against ex post facto laws. This issue was disposed of by theAbed court. In Abed, the court was confronted with the petitioner's claim that Administrative Directive 6.4, making security risk group threat members ineligible for statutory good time, violated the ex post facto prohibition. The court stated; CT Page 5874
 "We have long held that `[a]n act ex post facto relates to crimes only'; it is emphatically the making of an innocent action criminal. . . ." (citations omitted) There is nothing in directive 6.14 that attempts to criminalize an otherwise lawful act. (citations omitted) The ex post facto clause does not prevent prison administrators from adopting and enforcing reasonable regulations that are consistent with prison administration safety, and efficiency. (citations omitted)" Abed v. Commissioner, supra., 43 Conn. App. 182.
The court also agrees with the arguments advanced by the respondent that even if the Administrative Directive could be construed to be a law, the purpose of this "legislation" is not to punish but to control inmate behavior and to maintain security and order. cf. State v. Santiago, 240 Conn. 97 (1997)
Also, contrary to the assertions of the petitioners, the Commissioner's action in adopting Administrative Directive 9.4 did not have the effect of lengthening their sentences. Good time represents a commutation of one's sentence. cf. Steve v.Commissioner, 39 Conn. App. 455 (1995); Wilson v. Warden,34 Conn. App. 503 (1994). Conversely, the failure to earn good time, or a forfeiture of good time, does not amount to a lengthening of one's sentence, but merely a reduction of the commutation.
For the reasons stated, the petitions are dismissed.
Bishop, J.