[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This habeas corpus petition brought by the petitioner, Dale R. Harris, Jr., was transferred from the Judicial District of Tolland at Rockville to this Court. By amended petition dated October 1, 2000, the petitioner claims ineffective assistance of counsel at his trial in 1998, including failure to properly investigate, failure to call vital witnesses, etc. In his memorandum of law dated December 28, 2000, the petitioner elaborated on the amended petition claiming that he was arrested in Oregon on a fugitive warrant on October 6, 1997 and was in custody in. Oregon until January 1998, at which time he was taken into custody by the United States Marshall Service and transported, in custody in a circuitous route to Stewart Air Force Base in New York State where he was picked up by police from Bethel, Connecticut and returned to Bethel, Connecticut on that day which was February 11, 1998. Petitioner has claimed that he should get credit for the 129 days he spent in custody in Oregon and while in transit back to Connecticut. Petitioner has raised at the time of trial of this habeas petition held on January 29, 2001, February 2, 2001 and February 15, 2001, that his trial counsel was ineffective in failing to notify petitioner that the trial had been scheduled for April 22, 1997 as a result of which the petitioner did not return in time for trial, and that this lack of notice was the cause of his having to spend the aforementioned 129 days in custody for which he has claimed credit. This last issue was brought up during the trial although there had not been an amended petition on this issue. Senior Assistant State's Attorney Warren Murray, representing the Respondent, claimed that he did not have proper notice of this claim. The Court allowed the testimony to go forward and gave two continuances to allow Attorney Murray to respond on February 2, 2001 and on February 15, 2001. Therefore, there was no prejudice CT Page 2926 against the Respondent as the result of the failure to properly amend the petition to make this latter claim. The Petitioner, on order of this Court, filed another amended petition dated February 16, 2001 and filed February 17, 2001 to conform to the evidence at trial, particularly par. 8b. The Court will assume that Respondent denies this claim as he did at the habeas trial.
After a trial before a jury on charges of driving while intoxicated, etc., the Honorable Chase Rogers, Judge, sentenced the petitioner on July 30, 1998 to a term of imprisonment of four years and three months, which sentence he is presently serving in the custody of the Department of Corrections.
The Court will now address the three claims aforementioned made by the petitioner.
1. As for the claim of ineffective assistance of counsel at the criminal trial in Danbury, this Court has listened to the evidence, and based upon the totality of the evidence concludes that the petitioner has failed to prove that the representation of petitioner's counsel, Scott Chamberlain, at trial, fell below the range of competence displayed by lawyers with ordinary training and skill in the criminal law. "For the Petitioner to prevail on his claim of ineffective assistance of counsel, he must establish both that his counsel's performance was deficient and that there is a reasonable probability that, but for counsel's mistakes, the result of the proceeding would have been different" Strickland v.Washington, 466 U.S. 668, 694, 104 S.Ct. 2052 (1984). The Court finds that Attorney Chamberlain's performance at trial was not deficient.
2. As for the petitioner's claim that he deserves to be credited with the 129 days spent in Oregon and in transit in custody because he did not really refuse extradition, this Court is bound by the decision in Hammondv. Commissioner, 54 Conn. App. 11 (1999) which denies credit to inmates who are either resisting extradition or awaiting extradition. Although that case is on appeal to the Connecticut Supreme Court, the appeal has not yet been decided. However, Hammond v. Commissioner, supra, relied on the case of Johnson v. Manson, 196 Conn. 309 (1985) which held that under C.G.S. Sec. 18-98, in order to receive credit for pre-trial confinement the prisoner must have spent the time in a community correctional center which that Court concluded was applicable only to a Connecticut correctional
center and not one out of state. Justice David Shea dissented from this decision and stated, inter-alia, "From the inside, all jails look alike; and when a person is confined during the period necessary for disposition of a criminal charge, time passes no more swiftly awaiting the resolution of one step of the process than another." Id. 332. Even if the Court were to agree with Justice Shea, at least where extradition is not refused, CT Page 2927 Justice Shea's comments were a dissent, and this Court is bound by the majority opinion which is as aforementioned. Accordingly, the petitioner's second claim is rejected.
3. The remaining issue is more complex, and consumed at least the last two trial sessions before this Court. The Court's decision on this issue, whether trial counsel was ineffective in failing to notify the petitioner of the trial date once it was scheduled, depends in part upon the credibility of the witnesses. The Court has listened to all of the witnesses and has made a judgment about their credibility. This judgment is based upon their demeanor on the witness stand, their ability and inability to remember certain facts, the consistency or inconsistency of their statements and testimony, and the inconsistency, if any, of their testimony with other evidence in this case. Based upon the totality of the evidence, including the credibility of the witnesses, this Court makes the following findings:
(1) The petitioner told Attorney Chamberlain and/or Attorney James Driscoll who was Attorney Chamberlain's partner or associate that the number given on his intake sheet was the number at the petitioner's apartment. However, petitioner also told Chamberlain and/or Driscoll to call his parents as a way to reach him. This relationship between the petitioner and his said attorneys has to be viewed on the basis of the background or history of this representation. When petitioner was released on bail on March 25, 1997, he drove to Attorney Chamberlain's office. Attorney Chamberlain met him outside, and, according to Attorney Driscoll, Attorney Chamberlain and the petitioner engaged in a heated argument, Attorney Driscoll claiming that the petitioner was intoxicated at the time. The Court does find that based upon the totality of the evidence the petitioner is not a reasonable person at all times and is and was a difficult client for any attorney. it is unclear as to whether petitioner advised his attorneys of his mother's phone number; however, Carol and Dale Harris, Sr., his parents, have lived at the same address in the relatively small town of Bethel, Connecticut, for approximately thirty years, and their telephone number was clearly listed in the telephone book at all times.
(2) Trial counsel, namely Attorneys Chamberlain and Driscoll, had a duty to petitioner to make every reasonable effort to contact him to advise him of the trial date once it had been scheduled for April 22, 1997.
(3) Therefore, the Court will look at what efforts were made by said attorneys to contact the petitioner. Attorney Chamberlain admitted he did not attempt to contact the petitioner directly. He told his staff to do so and believes that they did. That statement the Court finds CT Page 2928 unreliable. It was without proper foundation and/or it was hearsay. This Court then continued the case until February 15, 2001, in order to give the respondent time to bring to testify members of Attorney Chamberlain's staff who could verify that they contacted petitioner's mother or father. The only witness presented was Attorney James Driscoll who was either a partner or associate of Attorney Chamberlain and did appear in Court with Attorney Chamberlain on April 22, 1997. Attorney Driscoll testified that he called the telephone number listed in the intake sheet which was petitioner's apartment number, and there was no answer at that number when he called. That is the only call he made to reach the petitioner. He then called the bondsman, Robert Kahn (hereinafter "Kahn"), his referral to him sometimes being known as passing the buck. Kahn testified that he contacted the petitioner's parents who were Carol Harris and Dale Harris, Sr., and that he was told that they didn't know where petitioner was. He did call the Harris' home number of 744-0298. Kahn further claimed that he went to the parent's premises at 25 Kayview Avenue. Then it is unclear-as to whether he found them there and talked to them or found no one there. Carol Harris testified that she never received any contact from either of the petitioner's attorneys or any members of their staff and that she never spoke to Kahn. It is true that she worked full time, five days a week, and was gone for almost the entire day with the exception of coming home for lunch during her one hour lunch break. Dale Harris, Sr., was also employed and was not at home during the day. However, this Court is aware, having been an attorney in private practice for thirty-four years before becoming a member of the Court, that to call a client or a witness during the day is rarely sufficient. In order to extend sufficient efforts, efforts should be made to contact that individual or individuals during the evening[1] when they are more likely to be home. Dale Harris, Sr., testified on February 15, 2001, that he in fact did speak to Kahn. Several months after April 22, 1997, he heard from Kahn by telephone and Kahn stated that petitioner owed him money and he was trying to collect it. Dale Harris, Sr.'s response was to the effect that they often get calls from bill collectors seeking money from their son. He, Dale Harris, Sr., told Kahn that he has nothing to do with that and doesn't want to be involved in the collection of any bills owed by his son and please do not call back. According to Dale Harris, Sr., no mention was made of a trial date or that petitioner was needed in Court. He also stated that as far as he knew Kahn did not call back. Dale Harris, Sr., also testified that he became aware that Kahn, through other people, had repossessed the petitioner's motorcycle for payment of a bill owed to Kahn. by the petitioner. Carol Harris was also aware of that. The problem this Court has with Kahn's testimony is his memory of what took place and the vagueness of his testimony. He said that he contacted "them". Apparently, he contacted only Dale Harris, Sr. He contacted "them" by virtue of sending people to take the motorcycle. None of this is indicative of a specific, thorough or sufficient effort CT Page 2929 to contact the petitioner through his parents.
(4) There was no testimony by either Attorney Chamberlain or Attorney Driscoll that they attempted to contact the parents or the petitioner by mail. Such mailing would appear to be a logical step to take if they received no response as a result of telephone calls.
(5) There was testimony from Carol Harris that the petitioner called home at the end of August 1997 and was told that the motorcycle had been confiscated by Mr. Kahn. He was not told that Mr. Kahn was trying to locate him because, according to Dale Harris, Sr., no mention was made by Kahn of a Court date or that petitioner was being sought. Carol Harris testified that she had received a telephone call from a bounty hunter approximately at the end of July 1997. Knowing what a bounty hunter is and the dangers that could be incurred by an effort of a bounty hunter to apprehend the petitioner she did not reveal where petitioner was. The bounty hunter told Carol Harris that he was looking for her son because her son owed money to Kahn. Carol Harris did admit that sometime in late July or early August 1997 she told her son that a bounty hunter had called and what the conversation was.
(6) It should also be noted that in her original testimony Carol Harris stated that she knew where her son was when he left the state; namely, working in Texas and then moving on to Mesa, Arizona where he stayed with a friend by the name of Letrich. She testified that she had Letrich's phone number in Mesa and that Letrich knew where the petitioner was at all times when he was in Mesa. The petitioner had called her several times from Mesa well aware that a jury case was pending although no date had been set as far as he knew. For a period of time the petitioner was in a Scottsdale Arizona hospital, and each time he called from there or Mesa he asked whether or not his mother had heard from his attorney. Further, the petitioner left for Texas and then Arizona very early in April 1997, spent a short time in Texas before arriving in Arizona at Mesa. Carol Harris wired money to the petitioner on April 8, 1997 in Amarillo, Texas. He arrived in Mesa at his friend's house on April 9, 1997 and stayed a month. He and his mother decided that if he were called for trial, he would either drive back or if there was time pressure, she would send him money for airfare. What this clearly shows is that the petitioner not only called frequently to his mother but was in Mesa, Arizona at his friend's house the phone number of which was available to Carol Harris from the period of at least April 9, 1997 to May 9, 1997. Accordingly, petitioner could have been reached immediately by his mother in the days prior to the Court date of April 22, 1997 and could have been reached there at least up until May 9, 1997. If proper contact had been made with the mother, she would have been able to contact the petitioner in plenty of time for him to return to face trial. CT Page 2930
(7) The Court notes that it was particularly impressed with the credibility of Carol Harris and Dale Harris, Sr. In particular Carol Harris admitted when questioned by Attorney Murray that she had talked about her testimony with Attorney McCarthy prior to her testifying. A denial would have affected her credibility adversely. However, she told the truth. Dale Harris, Sr., although admittedly the petitioner's father, appeared to this Court to be a credible and candid witness.
(8) As to the reliability of the petitioner, the Court agrees with the respondent that he has often been not reliable. His record of driving while intoxicated, his difficulty with his attorneys, his frequent claims of ineffective assistance of most attorneys who represent him and the language he sometimes uses show a not particularly bright individual nor a reliable one. However, as this Court often advises jurors, you as the fact finders are the sole judges of the credibility of the witnesses. If you find them unreliable or mistaken or even untruthful in some respects you may believe them in other respects. As to all witnesses, you may believe none of their testimony, all of their testimony, or believe part of it and not the rest of it. This Court, as fact finder, although questioning the reliability overall of the petitioner, does believe that he was telling the truth when he testified that he would have come back immediately upon notice of the trial date. As to whether he should have been aware that the trial had been scheduled when he heard about Kahn's efforts to collect money due him and the bounty hunter calling and saying he was trying to collect money for Mr. Kahn, the Court finds that that was not sufficient notice to him that a trial date had been scheduled. The petitioner is a person who has been in debt frequently and was used to learning of creditors trying to obtain money from him. As to whether he was sophisticated enough to realize that these contacts meant that his attorneys were looking for him, the Court concludes that he was not. How sophisticated could he have been approaching a police officer at the Portland, Oregon railroad station, striking up a conversation with him and then identifying himself if he knew that the Court was looking for him? This Court does believe his testimony in that regard and concludes from that that he was not sufficiently sophisticated to be able to infer from the contact made by Kahn to his father and the phone call to his mother from the bounty hunter to warrant his believing that he should inquire back in Bethel as to whether or not a trial date had been scheduled. If he were more reliable, he probably would have called at least once or twice a week to his law firm, but he was an unreliable individual. Most people who frequently break the law are unreliable. If they were reliable, they would not get in trouble with the law. Perhaps, after the shouting match with Attorney Chamberlain at the end of March 1997 just before he left for Arizona, he may have felt reluctant to call his attorneys. Regardless of all of that this unreliability or lack of CT Page 2931 sophistication by the petitioner does not obviate the duty or necessity of trial counsel for the petitioner, namely Attorneys Chamberlain and Driscoll, to have made stronger efforts to contact the petitioner about the trial date. Attorney Chamberlain relying on his staff, and Attorney Driscoll making one phone call and then shifting everything to Kahn are hardly sufficient efforts to contact the petitioner. As indicated above, letters could have been sent to both the parents and to the petitioner for forwarding or, as attorneys often do, one of them could have stopped by at the parent's house and told them directly who they were and what the problem was. The parents certainly would have trusted the attorneys for their son more so than the bondsman or the bounty hunter. The fact that the clerk of the court tried to contact the petitioner and was unsuccessful as indicated in the transcript again does not preclude the duty and necessity of the attorneys from taking more action than they did to contact the petitioner. Further, said attorneys did not ask for a bail letter to be sent nor did they ask for a continuance. A letter from the bail commissioner to the petitioner's apartment and a bail letter to the parents of the petitioner at the parents' home would have been read, at least the one to the parents' home coming from a court official. The Court has little doubt they would have opened it and read that he was being sought for trial and then contacted him in Mesa, Arizona to advise him that he was being sought for trial.
Accordingly, this Court finds that Attorney Chamberlain's and Attorney Driscoll's assistance as counsel to the petitioner was ineffective by their failures to take sufficient efforts to notify the petitioner of the actual trial date including failure to request a continuance or at least a bail commissioner's letter to obtain more time to contact the petitioner. Such assistance was below the standard of competence for criminal defense attorneys with ordinary training and skill in the criminal law. Counsels' representation as described fell below an objective standard of reasonableness and competence as measured by prevailing professional norms. The actual prejudice prong of Strickland,
supra, is obvious; namely if said counsel had done their jobs properly and notified the petitioner of the trial date, which they could have done under all the circumstances, except for their ineffectiveness, the Court is convinced that the petitioner would have returned to Connecticut in time for the trial and would not have spent 129 days in Oregon and in transit back to Bethel for which he did not receive credit.
Accordingly, this habeas petition is granted, and the respondent is ordered to give to the petitioner credit for an additional 129 days and reduce his sentence by that amount.
Rittenband, JTR CT Page 2932
Note: The Court would like to thank Attorneys McCarthy and Murray for their professionalism, dedication, passion, and tenacity in presenting what turned out to be a somewhat complex matter.